# UNITED STATES COURT OF APPEAL
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **COLUMBUS ELECTRIC COOPERATIVE, INC.,** | **Case No. 23-1158** |
| **Petitioner,** | |
| **v.** | **PETITION FOR REVIEW** |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 611, AFL-CIO,** | |
| **Respondent.** | |

Pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), and Fed. R App. P. 15(a), Columbus Electric Cooperative, Inc. ("CEC"), hereby petitions the Court for review and set aside the National Labor Relations Board's Decision and Order in *Columbus Electric Cooperative, Inc.*, NLRB Case Number Case 28-CA-285046 as reported in a Decision and Order at 372 NLRB No. 89 dated June 8, 2023 and served on CEC on June 8, 2023. A copy of the Decision and Order is attached as Exhibit A.

The Court has jurisdiction in this matter pursuant to Section 10(f) of the National Labor Relations Act ("Act") because the NLRB's Decision and Order is a final order. *See* 29 U.S.C. § 160(f). CEC is a party aggrieved by said Decision and Order. Section 10(f) expressly authorizes an appeal of the NLRB's Decision and Order in the United States Court of Appeals for the District of Columbia.

WHEREFORE, CEC prays that its Petition for Review of the Board's Decision and Order be granted; that upon such review the Board's Decision and Order be set aside and denied enforcement; and that CEC be granted whatever other and further relief as the Court deems appropriate. CEC is also filing a Corporate Disclosure Statement herewith.

Dated:  June 20, 2023

Respectfully submitted,

JACKSON LEWIS P.C.

By:    */s/ Alan M. Bayless Feldman*
       Alan M. Bayless Feldman (AZ Bar No.
       019074, TX Bar No. 24050051)
       **JACKSON LEWIS P.C.**
       2111 E. Highland Ave., Suite B-250
       Phoenix, AZ 85016
       Telephone: (602) 714-7042
       Email: Alan.Feldman@jacksonlewis.com

By:    */s/ Danny W. Jarrett*
       Danny W. Jarrett (NM Bar 8982)
       **JACKSON LEWIS P.C.**
       500 Marquette Avenue NW
       Suite 150
       Albuquerque, NM 87102
       Telephone: (505) 878-0515
       Email: Danny.Jarrett@jacksonlewis.com
       (Motion Forthcoming)

       **Attorneys for Respondent**
       **Columbus Electric Cooperative, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that, on June 20, 2023, I electronically filed the foregoing **PETITION FOR REVIEW** with the Clerk of the Court using the CM/ECF system. I further certify that on June 20, 2023 a true and correct copy of the foregoing **PETITION FOR REVIEW** was served on the following individuals addressed to them at the following address.

COPIES emailed this same date to:

Ruth E. Burdick, Appellate and Supreme Court Litigation Branch
Jennifer Abruzzo, General Counsel
Roxanne L. Rothschild, Executive Secretary
National Labor Relations Board
1015 Half Street, S.E.
Washington D.C. 20570
appellatecourt@nlrb.gov
Roxanne.Rothschild@nlrb.gov

Cornele A. Overstreet, Regional Director
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Cornele.Overstreet@nlrb.gov

Judith E. Davila, Counsel for the General Counsel
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Judith.Davila@nlrb.gov

Shane Youtz, Attorney at Law
Stephen Curtice, Attorney at Law
James A. Montalbano, Attorney at Law
Youtz and Valdez, P.C.
900 Gold Avenue SW
Albuquerque, NM 87102
shane@youtzvaldez.com
stephen@youtzvaldez.com
james@youtzvaldez.com

Peter Trujillo, Business Manager
International Brotherhood of Electrical Workers, Local 611
4921 Alexander Boulevard, Suite A
Albuquerque, NM 87107
petetrujillo@ibew611.org

/s/ *Amalia Tafoya*
4865-0229-7194, v. 1

# UNITED STATES COURT OF APPEAL
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **COLUMBUS ELECTRIC COOPERATIVE, INC.,** | **Case No. 23-1158** |
| **Petitioner,** | |
| **v.** | **PETITIONER'S CORPORATE DISCLOSURE STATEMENT** |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 611, AFL-CIO,** | |
| **Respondent.** | |

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1, Petitioner Columbus Electric Cooperative, Inc. a New Mexico corporation, hereby states that it has no parent corporation and that none of its stock is owned by a publicly-held corporation.

Dated:  June 20, 2023

Respectfully submitted,

JACKSON LEWIS P.C.

By:     */s/ Alan M. Bayless Feldman*
Alan M. Bayless Feldman (AZ Bar No. 019074, TX Bar No. 24050051)

**JACKSON LEWIS P.C.**
2111 E. Highland Ave., Suite B-250
Phoenix, AZ 85016
Telephone: (602) 714-7042
Email: Alan.Feldman@jacksonlewis.com

By:     */s/ Danny W. Jarrett*
Danny W. Jarrett (NM Bar 8982)
**JACKSON LEWIS P.C.**
500 Marquette Avenue NW
Suite 150
Albuquerque, NM 87102
Telephone: (505) 878-0515
Email: Danny.Jarrett@jacksonlewis.com
(Motion Forthcoming)
**Attorneys for Respondent**
**Columbus Electric Cooperative, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that, on June 20, 2023, I electronically filed the foregoing **PETITIONER'S CORPORATE DISCLOSURE STATEMENT** with the Clerk of the Court using the CM/ECF system. I further certify that on June 20, 2023 a true and correct copy of the foregoing **PETITIONER'S CORPORATE DISCLOSURE STATEMENT** was served on the following individuals addressed to them at the following address.

COPIES emailed this same date to:

Ruth E. Burdick, Appellate and Supreme Court Litigation Branch
Jennifer Abruzzo, General Counsel
Roxanne L. Rothschild, Executive Secretary
National Labor Relations Board
1015 Half Street, S.E.
Washington D.C. 20570
appellatecourt@nlrb.gov
Roxanne.Rothschild@nlrb.gov

Cornele A. Overstreet, Regional Director
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Cornele.Overstreet@nlrb.gov

Judith E. Davila, Counsel for the General Counsel
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, AZ 85004
Judith.Davila@nlrb.gov

Shane Youtz, Attorney at Law
Stephen Curtice, Attorney at Law
James A. Montalbano, Attorney at Law
Youtz and Valdez, P.C.
900 Gold Avenue SW
Albuquerque, NM 87102
shane@youtzvaldez.com
stephen@youtzvaldez.com
james@youtzvaldez.com

Peter Trujillo, Business Manager
International Brotherhood of Electrical Workers, Local 611
4921 Alexander Boulevard, Suite A
Albuquerque, NM 87107
petetrujillo@ibew611.org

/s/ *Amalia Tafoya*
4876-4727-7162, v. 1

EXHIBIT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Columbus Electric Cooperative, Inc. *and* International Brotherhood of Electrical Workers, Local 611, AFL–CIO.** Case 28–CA–285046

June 8, 2023

DECISION AND ORDER

By Chairman McFerran and Members Wilcox and Prouty

On September 19, 2022, Administrative Law Judge Jeffrey D. Wedekind issued the attached decision. The Respondent and the General Counsel each filed exceptions, a supporting brief, an answering brief, and a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions,[2] to

---

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

In finding that the Respondent violated Sec. 8(a)(5) and (1) of the Act by engaging in overall bad-faith bargaining, the judge properly relied on a number of factors. See, e.g., *Mid-Continent Concrete*, 336 NLRB 258, 259 (2001) ("In determining whether an employer has engaged in overall bad-faith bargaining, the Board examines the totality of the employer's conduct, both at and away from the bargaining table."), enfd. sub nom. *NLRB v. Hardesty Co*., 308 F.3d 859 (8th Cir. 2002). Specifically, as detailed in his decision, the judge found bad-faith bargaining based on the following conduct by the Respondent: failure to timely respond to the Union's requests to begin negotiations; insistence on recording the parties' first bargaining session; refusing to bargain pending resolution of the Union's unfair labor practice charges; making proposals that deprived the Union of its representative role, including insisting on broad management- rights and no-strike provisions and reserving to the Respondent final authority on adverse employment actions, thereby precluding independent review by an arbitrator; making regressive bargaining proposals on matters such as 401(k) contributions, disciplinary matrices, and grievance filing periods; making and failing to revise unreasonable and incorrect proposals; and refusing to provide the Union with relevant requested information. We agree, for the reasons stated by the judge, that the totality of the Respondent's conduct demonstrated overall bad-faith bargaining in violation of Sec. 8(a)(5) and (1). We further find that, because the Respondent did not bargain in good faith, the parties did not reach a valid bargaining impasse at the close of their final negotiating session on December 4, 2021. See, e.g., *U.S. Ecology Corp*., 331 NLRB 223, 226 (2000) (finding no valid impasse existed because employer had not bargained in good faith), enfd. 26 Fed.Appx. 435 (6th Cir. 2001).

[2] In affirming the judge's conclusion that the Respondent violated Sec. 8(a)(5) and (1) by failing and refusing to bargain in good faith with the Union, we note that the Sec. 10(b) period for this violation commenced on April 25, 2021, 6 months before the date of the filing of the unfair labor practice charge and service on the Respondent, and not April 22, 2021, as referenced by the judge. We shall amend the judge's remedy and modify his recommended order in accordance therewith.

In its exceptions, the Respondent contends that it did not engage in overall bad-faith bargaining and cites several cases in support of its position, but we find those cases distinguishable on their facts from the instant case. See, e.g., *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118, slip op. at 3, 5, 7 fn. 20 (2021) (no bad-faith bargaining where employer significantly modified its initial proposals, including withdrawing its no-strike proposal), remanded sub nom. *1199SEIU United Healthcare Workers East v. NLRB*, 2022 U.S. App. LEXIS 1540 (D.C. Cir. 2022); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 1–2, 7–8 (2019) (no bad-faith bargaining where employer's proposals included an arbitration provision and the employer demonstrated its willingness to make disciplinary and management-rights-related concessions), affd. sub nom. *International Alliance of Theatrical Stage Employees, Local 15 v. NLRB*, 957 F.3d 1006 (9th Cir. 2020); *Oklahoma Fixture Co*., 331 NLRB 1116, 1118–1119 (2000) (employer's insistence on union hiring hall provision and willingness to make concessions to achieve it did not constitute bad-faith bargaining), enfd. 332 F.3d 1284 (10th Cir. 2003) (en banc); *Formosa Plastics Corp., Louisiana*, 320 NLRB 631, 659 (1996) (judge found no bad-faith bargaining where employer's bargaining strategy was deemed "to be one of progressive concessions," including willingness to agree to binding arbitration); *Coastal Electric Cooperative*, 311 NLRB 1126, 1127 (1993) (no bad-faith bargaining where employer did not insist on a no-strike clause and made bargaining concessions); *Reichhold Chemicals*, 288 NLRB 69, 70-71 (1988) (no bad-faith bargaining where employer made bargaining concessions leading to agreements on grievance procedure, arbitration, subcontracting, and layoffs provisions), enfd. in relevant part sub nom. *Teamsters Local 515 v. NLRB*, 906 F.2d 719 (D.C. Cir. 1990); *Atlanta Hilton & Tower*, 271 NLRB 1600, 1603 (1984) (employer's insistence on a 1-year extension of the existing agreement did not itself constitute bad-faith bargaining); *Arkansas Louisiana Gas Co*., 154 NLRB 878, 886–888 (1965) (employer's broad management-rights clause proposal did not demonstrate bad faith where certain aspects of the clause were subject to grievance and arbitration procedures); *NLRB v. Crockett-Bradley, Inc*., 598 F.2d 971, 974 (5th Cir. 1979) (same). Chairman McFerran adheres to her dissenting positions in *The George Washington Hospital*, supra, and *PSAV Presentation Servs*., supra, but agrees with her colleagues that these cases are factually distinguishable from the instant case.

In joining her colleagues' overall bad-faith bargaining finding, Member Wilcox notes that the Respondent's proposals would have left the employees with substantially fewer rights and less protection than provided by law without a contract. See *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 489 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003).

The General Counsel excepted to the judge's finding that the Respondent's bargaining proposals did not constitute an independent violation of Sec. 8(a)(5) and (1). We find it unnecessary to pass on the judge's finding because it would not materially affect the remedy.

In joining her colleagues in affirming the judge's additional finding that the Respondent violated Sec. 8(a)(5) and (1) by failing and refusing to provide requested information about its subcontracting, Member Wilcox notes that she would consider revisiting the Board's framework for analyzing union requests for nonunit information in a future appropriate proceeding.

2                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

amend the remedy, and to adopt the recommended Order as modified and set forth in full below.

AMENDED REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain steps to effectuate the policies of the Act. With respect to the Respondent's failure to bargain in good faith, for the reasons set forth by the judge, we order the Respondent to: (1) submit written progress reports to the NLRB Region 28 compliance officer, with service on International Brotherhood of Electrical Workers, Local 611, AFL–CIO (Union), every 30 calendar days until an agreement or good-faith impasse is reached; (2) compensate the Union for all bargaining expenses it has incurred from April 25, 2021 through December 4, 2021; and (3) provide the Union with the information it requested on October 4, 2021 regarding the use of contractors to perform unit work. Specifically, we also amend the judge's remedy in the following respects.

We order the Respondent to make whole any affected employee negotiators for any earnings lost while attending bargaining sessions, to the extent those earnings were not reimbursed by the Union. See *M.F.A. Milling Co.*, 170 NLRB 1079, 1080 (1968), enfd. sub nom. *Laborers Local 676 v. NLRB*, 463 F.2d 953 (D.C. Cir. 1972). We find this remedy appropriate under the circumstances in order to make any affected employee-negotiators whole for lost earnings resulting from the Respondent's bad-faith bargaining. *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 371 NLRB No. 118, slip op. at 2–3 fn. 6 (2022). In this regard, backpay shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). Further, we shall order the Respondent to compensate the affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and to file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s) for each employee. *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016). In accordance with our decision in *Cascades Container-board Packaging–Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), we shall order the Respondent, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, or such additional time as the Regional Director for Region 28 may allow for good cause shown, to file with the Re-

gional Director for Region 28 a copy of each backpay recipient's corresponding W-2 forms reflecting the back-pay award.

Having found that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union in good faith during first contract negotiations, the judge recommended an affirmative bargaining order to remedy this unlawful conduct. For the reasons set forth in *Caterair International*, 322 NLRB 64 (1996), we agree that an affirmative bargaining order is warranted in this case as a remedy for the Respondent's unlawful failure and refusal to bargain in good faith. The Board has consistently held that an affirmative bargaining order is "the traditional, appropriate remedy for an 8(a)(5) refusal to bargain with the lawful collective-bargaining representative of an appropriate unit of employees." Id. at 68.

In several cases, however, the United States Court of Appeals for the District of Columbia Circuit has required that the Board justify, on the facts of each case, the imposition of such an order. See, e.g., *Vincent Industrial Plastics v. NLRB*, 209 F.3d 727, 738–740 (D.C. Cir. 2000); *Lee Lumber & Building Material Corp. v. NLRB*, 117 F.3d 1454, 1460–1462 (D.C. Cir. 1997); *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1248–1249 (D.C. Cir. 1994). In *Vincent*, supra, 209 F.3d at 738, the court summarized its requirement that an affirmative bargaining order "must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' [Section] 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act."

Although we respectfully disagree with the court's requirement for the reasons set forth in *Caterair*, supra, we have examined the particular facts of this case as the court requires and find that a balancing of the three factors warrants an affirmative bargaining order.

(1) An affirmative bargaining order in this case vindicates the Section 7 rights of the unit employees, who were denied the benefits of collective bargaining by the Respondent's refusal to bargain in good faith with the Union. By refusing to bargain in good faith and thereby frustrating the possibility of securing a first contract, the Respondent unlawfully deprived unit employees of the opportunity to obtain the stability and predictability such an agreement would provide. At the same time, an affirmative bargaining order, with its attendant bar to raising a question concerning the Union's continuing majority status for a reasonable time, does not unduly prejudice the Section 7 rights of employees who may oppose continued union representation because the duration of the

order is no longer than is reasonably necessary to remedy the ill effects of the violation. To the extent such opposition exists, moreover, it may be, at least in part, the product of the Respondent's failure and refusal to bargain in good faith.

(2) An affirmative bargaining order also serves the policies of the Act by fostering meaningful collective bargaining and industrial peace. That is, it removes the Respondent's incentive to delay bargaining in the hope of further discouraging support for the Union. It also ensures that the Union will not be pressured to achieve immediate results at the bargaining table following the Board's resolution of its unfair labor practice charge and the issuance of a cease-and-desist order. Under these circumstances, a reasonable period during which the Union's majority status cannot be challenged clearly fosters meaningful collective bargaining.

(3) A cease-and-desist order, alone, would be inadequate to remedy the Respondent's unlawful failure and refusal to bargain in good faith because it would permit a challenge to the Union's majority status before the taint of the Respondent's unlawful conduct has dissipated, and before the employees have had a reasonable time to regroup and bargain through their representative in an effort to reach a first contract. Such a result would be particularly unjust in the circumstances presented here, where the Respondent's unlawful conduct frustrated any real progress toward achieving a collective-bargaining agreement—for which unit employees, not privy to the Respondent's conduct, would probably fault their bargaining representative, at least in part—further tending to undermine the unit employees' support for the Union. Thus, the Respondent's failure to bargain in good faith would likely have a continuing effect, tainting any employee disaffection from the Union for a period of time after the issuance of this decision and order. Moreover, the imposition of a bargaining order would signal to employees that their rights guaranteed under the Act will be protected. We find that these circumstances outweigh the temporary impact the affirmative bargaining order will have on the rights of employees who oppose continued union representation.

For all the foregoing reasons, we find that an affirmative bargaining order with its temporary decertification bar is necessary to fully remedy the Respondent's violation of Section 8(a)(5) and (1) of the Act.

We additionally order a 12-month extension of the certification year pursuant to *Mar-Jac Poultry*, 136 NLRB 785 (1962). As discussed more fully above and in the judge's decision, following the Union's certification, the Respondent consistently sought to obstruct and delay negotiations. The Respondent first sent the Union sub-

stantive proposals almost a year after certification and, as the judge found, many of its proposals would have deprived the Union of its representational role and demonstrated an intent to avoid or frustrate reaching any agreement. For about 10 months thereafter, the Respondent refused to meaningfully revise its proposals and engaged in additional conduct demonstrating overall bad-faith bargaining. Under these circumstances, the Respondent effectively denied the Union its full opportunity to bargain during the entirety of the certification year. See *Northwest Graphics, Inc.*, 342 NLRB 1288, 1289 (2004), enfd. 156 Fed.Appx. 331 (D.C. Cir. 2005). The Union is therefore entitled to a 12-month extension of the certification year from the time that the Respondent begins to bargain in good faith. See *Burrows Paper Corp.*, 332 NLRB 82, 82 fn. 3 (2000).[3]

ORDER

The National Labor Relations Board orders that the Respondent, Columbus Electric Cooperative, Inc., Deming and Animas, New Mexico, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to recognize and bargain with International Brotherhood of Electrical Workers, Local 611, AFL–CIO (Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

---

[3] The General Counsel requests the Board to order a remedial bargaining schedule. We decline to do so for the reasons set forth by the judge. The General Counsel also requests that we adopt a compensatory remedy requiring the Respondent to make its employees whole for the lost opportunity to bargain at the time and in the manner contemplated by the Act. To do so would require overruling *Ex-Cell-O Corp.*, 185 NLRB 107 (1970). We have previously severed and retained this issue for future consideration. See, e.g., *Longmont United Hospital*, 371 NLRB No. 162, slip op. at 2 (2022).

To remedy the bad-faith bargaining violation, Member Prouty would authorize, at the Union's request, the Regional Director for Region 28 to ask that the Federal Mediation and Conciliation Service appoint an appropriately qualified mediator to assist the bargaining parties. In Member Prouty's view, the affirmative bargaining order and progress report remedy "may be insufficient to cause [the] Respondent to genuinely change its mind and view concerning the efficacy of union representation and bargaining," and a mediator would perhaps "cause [the] Respondent to alter its *conduct*. It would also provide the Board with a window through which to observe the negotiations and to receive a firsthand neutral report of the bargaining." *Altorfer Machinery Co.*, 332 NLRB 130, 131 (2000) (Member Hurtgen, concurring in part) (emphasis in original). The mediator would be authorized to attend bargaining sessions and meet with the parties (together or separately) as often as the mediator deems appropriate. If, after a time decided by the mediator, the mediation efforts fail, Member Prouty would "direct the mediator to render a report to the parties and to the Regional Director as to the status of negotiations and his or her recommendations concerning the resolution of the non-agreed-upon matters." *Mid-Continent Concrete*, 336 NLRB 258, 263 (2001) (Chairman Hurtgen, concurring in part).

4                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(b)  Refusing to bargain collectively with the Union by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

(c)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time apprentice lineman and journeyman lineman employed by Employer; excluding all other employees, clerical employees, guards, and supervisors as defined by the Act.

The certification year shall extend 12 months from the date the Respondent begins to bargain in good faith.

(b)  Submit written bargaining progress reports every 30 days to the NLRB Region 28 compliance officer, with service on the Union, until an agreement or good-faith impasse is reached.

(c)  Compensate the Union for all bargaining expenses it has incurred from April 25, 2021, through December 4, 2021.  Upon receipt of a verified statement of costs and expenses from the Union, the Respondent shall promptly submit a reimbursement payment in the stated amount to the NLRB Region 28 compliance officer, who will document receipt and forward the payment to the Union.

(d)  Make whole any affected employee negotiators for any earnings lost while attending bargaining sessions in the manner set forth in the remedy section of the judge's decision as amended in this decision, to the extent those earnings were not reimbursed by the Union.

(e)  Compensate affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar years for each employee.

(f)  File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 forms reflecting the backpay award.

(g)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h)  Furnish to the Union in a timely manner the information requested by the Union on October 4, 2021.

(i)  Post at its Deming and Animas facilities copies of the attached notice marked "Appendix."[4]  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed a facility involved in this proceeding, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at that facility at any time since April 25, 2021.

(j)  Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

---

[4]  If the facility involved in this proceeding is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region.  If the facility is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region.  If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Dated, Washington, D.C.  June 8, 2023

_____
Lauren McFerran,                    Chairman

_____
Gwynne A. Wilcox,                    Member

_____
David M. Prouty,                    Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

    Form, join, or assist a union
    Choose representatives to bargain with us on your behalf
    Act together with other employees for your benefit and protection
    Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to recognize and bargain with International Brotherhood of Electrical Workers, Local 611, AFL–CIO (Union) as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT refuse to bargain collectively with the Union by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of our unit employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time apprentice lineman and journeyman lineman employed by Employer; excluding all other employees, clerical employees, guards, and supervisors as defined by the Act.

WE WILL recognize that the certification year is extended for 12 months from the date that good-faith bargaining resumes.

WE WILL submit written bargaining progress reports every 30 days to the NLRB Region 28 compliance officer, with service on the Union, until an agreement or good faith impasse is reached.

WE WILL compensate the Union for all bargaining expenses it has incurred from April 25, 2021, through December 4, 2021.

WE WILL make whole any affected employee negotiators for any earnings lost while attending bargaining sessions, plus interest, to the extent those earnings were not reimbursed by the Union.

WE WILL compensate affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar years for each employee.

WE WILL file the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 forms reflecting the backpay award.

WE WILL furnish to the Union in a timely manner the information requested by the Union on October 4, 2021.

COLUMBUS ELECTRIC COOPERATIVE, INC.

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-285046 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

6              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD



*Judith E. Dávila, Esq.,* for the General Counsel.
*Alan M. Bayless Feldman, Esq. & Danny W. Jarret, Esq. (Jackson Lewis P.C.),* for the Respondent Company.
*James Montalbano, Esq. (Youtz & Valdez, P.C.),* for the Charging Party Union.

### DECISION

JEFFREY D. WEDEKIND, Administrative Law Judge. In early 2020, Electrical Workers Local 611 was elected and certified as the collective-bargaining representative of the apprentice and journeyman linemen employed by Columbus Electric Cooperative in Deming and Animas, New Mexico. Negotiations over a first contract covering the linemen got off to a slow start, however. The Union and CEC did not hold their initial bargaining session until late September, over 6 months after the Union's March 10 certification. And no further sessions were held the rest of the year.

The Union accused CEC of causing the delay and filed unfair labor practice charges alleging that it was unlawfully refusing to bargain in good faith. The charges also alleged that CEC unlawfully refused to provide certain employee disciplinary records the Union requested. These charges were eventually settled in late January 2021, with CEC agreeing to bargain in good faith and to provide the disciplinary records and other relevant and necessary information on request, but not admitting that its alleged conduct was unlawful.

The parties subsequently held several bargaining sessions and exchanged written proposals or counterproposals. However, they failed to reach agreement on several key items, including management rights, discipline, grievances, wages, and benefits. Eventually, the Union concluded that CEC was still not bargaining in good faith, and on October 22 it filed another unfair labor practice charge. Several weeks later, in early December, the Union advised CEC that it believed the negotiations had reached impasse, and CEC agreed.

The present NLRB complaint followed. As alleged in the Union's October 22 charge, the complaint alleges that CEC violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain in good faith since April 22, 2021 (the statutory 6-month limitations period). Specifically, it alleges that, among other things, CEC insisted on predictably unacceptable discipline, grievance, and other provisions; made regressive proposals on various subjects that were worse than its initial proposals; and otherwise bargained with no intention of reaching an agreement. It also alleges that CEC refused since early October 2021 to provide the Union with requested information regarding the use of contractors to perform unit work.

A hearing to litigate these alleged unfair labor practices was held on June 7–10, 2022.[1]

Thereafter, on July 15, the General Counsel and CEC filed posthearing briefs. As discussed below, the allegations are factually and legally well supported.[2]

#### I. THE RELEVANT FACTS

It is well established that an employer's total or entire course of conduct should be considered in evaluating whether it unlawfully bargained in bad faith with a union. This includes, not just the employer's conduct during the 6-month period preceding the charge, but also the employer's previous conduct to the extent it may elucidate the true nature of the conduct within the limitations period. See, e.g., *Altura Communication Solutions, LLC,* 369 NLRB No. 85, slip op. at 3, 6, 35 fn. 22, and 37 (2020), enfd. mem. 848 Fed.Appx. 344 (9th Cir. 2021); *Regency Service Carts,* 345 NLRB 671, 672 fn. 3 (2005); *Freuhauf Trailer Services, Inc.,* 335 NLRB 393 fn. 5, 405 (2001); and *Crane Co.,* 244 NLRB 103, 110 (1979). See also *Machinists Local Lodge 1424 (Bryan Mfg. Co.) v. NLRB,* 362 U.S. 411, 416 (1960).

Here, the General Counsel made clear at the outset of the hearing that evidence regarding CEC's conduct since the Union was certified in March 2020, including the conduct alleged in the Union's settled charges, would be presented and relied on to establish that CEC bargained in bad faith since April 22, 2021. CEC objected to this, but consistent with the above-cited precedent and the settlement itself, which preserved the General Counsel's right to use and rely on evidence of the alleged presettlement conduct in future cases, CEC's objection was overruled.[3]

Accordingly, the relevant facts begin at the beginning.

#### A. The First 10 Months (March 2020 through January 2021)

To prepare for bargaining over a first contract, the Union's initial step, on March 16, was to email CEC a request for information regarding the linemen's current terms and conditions of employment. The Union requested CEC to provide the information by April 13, and the record indicates that CEC did so.[4]

Around this same time, on April 2, and again on July 1 and

---

[1] At the General Counsel's unopposed request, the hearing was held remotely via the Zoom for Government online platform. See GC Exh. 1(f). Jurisdiction is undisputed and established by the record. Unless otherwise indicated, CEC also does not dispute that any of the individuals who allegedly committed the unlawful conduct are its supervisors and/or agents within the meaning of the Act.

[2] Citations to the record are included to aid review and are not necessarily exclusive or exhaustive. (See ALJ Exh. 1 for transcript corrections.) In making credibility findings, all relevant factors have been considered, including the interests and demeanor of the witnesses; whether their testimony is corroborated or consistent with the documentary evidence and/or the established or admitted facts; inherent probabilities; and reasonable inferences that may be drawn from the record as a whole. See, e.g., *Daikichi Corp.,* 335 NLRB 622, 623 (2001), enfd. 56 Fed. Appx. 516 (D.C. Cir. 2003); and *New Breed Leasing Corp. v. NLRB,* 111 F.3d 1460, 1465 (9th Cir.), cert. denied 522 U.S. 948 (1997).

[3] See Tr. 13–14, 63–68, 198–200; and GC Exh. 29.

[4] GC Exh. 6; Tr. 58–59, 237–238.

27, the Union also emailed CEC requests for information regarding the recent discipline or discharge of certain unit employees in order to bargain and/or file grievances through CEC's normal process over those actions.  The April 2 email requested all documentation relied on and records of discipline issued to any employee in the past 12 months and any probationary employees in the last 24 months.  The July 1 email requested all documentation relied on for the discipline and all previous disciplines issued to both unit and nonunit employees for similar offenses.  And the July 27 email requested a list of unit employees disciplined over the past 11 months and a copy of their discipline.  CEC, however, failed or refused to provide this information.[5]

In the meantime, on June 24, the Union also emailed CEC a request for dates when it would be "available to start meeting and working out the details of a contract."  Over a month went by, however, without receiving any.  So, on July 29 the Union emailed CEC again.  The Union said it was "still waiting on dates for us to negotiate" and again asked CEC for "available dates . . . so that we may schedule dates to meet and bargain."[6]

CEC responded later that day.  However, it still did not provide any dates.  Instead, CEC advised that it was not willing to meet with the Union "in person" at that time due to the COVID-19 pandemic.  The Union replied the following day.  The Union said that it "never suggested in person meetings" or "asked to meet in person only," and that there were "electronic systems" they could use to meet and bargain.  The Union again asked for "available dates," stating that the parties could then discuss "the method" they would use to meet.[7]

Nevertheless, another month passed without receiving any dates from CEC.  Accordingly, the Union informed its attorney of the situation, and the attorney called CEC shortly after.  The attorney told CEC that if available dates were not provided to the Union by the end of the day, he would file a charge with the NLRB.

CEC eventually responded by email on Sept 10.  However, again, it did not provide any dates.  Instead, for the first time, CEC raised a question about which of the linemen the Union would be designating to attend the "virtual" bargaining sessions.  CEC stated that it needed to know because there were only seven journeyman and apprentice linemen in the unit; CEC's powerline maintenance services would be "interrupted" if even one of them did not work his full 4-day weekly schedule; and CEC therefore wanted to hold the bargaining sessions

on the designated lineman's day off.[8]

The Union replied the following day.  The Union said it had selected Albert Munoz, one of the three linemen who worked in Animas, to participate in the negotiations.  It also agreed to hold the initial bargaining session on a Friday, Munoz' day off, and suggested Friday, September 25, from 9 a.m. to 5 pm.  However, it requested that Munoz be released from work at least the day before so he could travel the 300 miles to the Union's office in Albuquerque to meet and prepare with the rest of the Union's bargaining team.  The Union also stated that it did not agree to meeting only on Fridays going forward.  Finally, the Union objected to "any further delays" in scheduling meetings and requested CEC to provide its available dates in October.[9]

It is unclear from the record when or how CEC responded to the Union's September 11 email.  However, CEC agreed to meet on September 25 as proposed.  As for the Union's request to release Munoz the day before, the Union asked CEC on September 18 and asked if CEC was going to "accommodate" that request.  CEC responded that Munoz had requested "vacation time" for that day, and that CEC granted his request.[10]

The parties subsequently met on September 25 via Zoom, as agreed.  Attending for CEC were Chris Martinez, its executive vice president and general manager; Nancy Long, its attorney; and Susanna Morris, its HR supervisor.  Attending for the Union and the linemen were Assistant Business Managers Mark Strand and Shannon Fitzgerald, and Munoz.

As CEC had scheduled the Zoom meeting, it controlled the Zoom host tools, including the recording tool.  And CEC immediately began recording the session.  However, CEC had not previously asked the Union's permission or agreement to do so, and the Union objected when the Zoom recording notification appeared on the screen.  The Union argued that recording was something that had to be negotiated as part of the ground rules.  And it emailed CEC a list of proposed ground rules, one of which stated that there would be no electronic recording of the bargaining sessions.

CEC disagreed and refused to turn off the Zoom recording tool.  It also expressed disagreement with one of the Union's other proposed ground rules regarding tentative agreements (TAs).  The proposed rule provided that TAs would be reduced to writing, initialed, and dated by the chief negotiators and could not thereafter be altered or reopened unless both parties agree.  CEC said it would not do such "piecemeal" bargaining; that it would not sign anything until an entire agreement had been reached.  It also said that any proposals would have to be reviewed and approved by CEC's board of trustees.

The Union at that point repeated its objection to recording the bargaining session.  The Union argued that recording was a non-mandatory/permissive subject and CEC could not insist on it to impasse.[11]  The Union said it would not continue negotiat-

---

  [5] GC Exhs. 26–28; Tr. 258–262, 265–266.

  [6] GC Exhs. 7, 8.

  [7] GC Exh. 9.  All of the email communications about scheduling bargaining dates during this time were between Mark Strand, the Union's assistant business manager, and Nancy Long, CEC's attorney.  Long's July 29 email response to Strand indicates that she had previously "told" him "numerous times" that in-person meetings were unsafe during the pandemic.  However, there is no other, nonhearsay record evidence of this.  Long did not testify and there is no other evidence that Long had previously done so in response to the Union's initial June 25 email requesting dates.  Strand testified (Tr. 62) that all communications between him and Long about scheduling dates were by email; his testimony was uncontroverted; and no emails other than those referenced here were introduced at the hearing.

  [8] GC Exh. 10; Tr. 62–63.

  [9] GC Exh. 11; Tr. 63, 68, 83.

  [10] R. Exh. 7.

  [11] "[E]ach party is free to bargain or not to bargain, and to agree or not to agree," with respect to permissive/nonmandatory subjects of

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ing if CEC did not stop recording the session. CEC, however, again refused to do so. The session therefore ended without any further discussion.

However, either shortly before or after the session ended, the Union emailed CEC a proposed collective-bargaining agreement. The proposed contract was for a one-year term and contained 23 articles.

Regarding union membership and dues, the Union's proposal:

- required all employees to become and remain members of the Union, i.e., to tender periodic dues and fees, within 30 days of employment (art. 3); and
- stated that CEC would deduct periodic dues from the pay of unit employees' who voluntarily executed a dues check-off form (art. 4).

Regarding wages and benefits, the proposal:

- increased the wages of the journeymen and apprentice linemen 12 to 17 percent (between $3 and $5 per hour) (art. 23);
- required CEC to equalize overtime hours among employees (art. 9); and to pay double-time for holiday work and double-time for after-midnight work until the employee received an 8-hour rest period (art. 10);
- required CEC to rotate and limit on-call status; to pay employees two hours pay while on call and five hours pay if it was on a day off or holiday; and to pay employees $75 per month for use of their personal cell phone (art. 12);
- stated that employees would not be deprived of weekly earnings because of inclement weather (art. 18); and
- maintained current benefits with no increases in employee costs (art. 21).

Regarding management rights, discipline, and grievances, the proposal:

- stated that CEC's management rights were "unqualified" so long as they were "not expressly prohibited by this agreement," and that CEC retained "all rights not prohibited by this Agreement"; but added limiting language stating that, among other things, CEC had the right to schedule operations, shifts, rest breaks and lunch breaks, overtime and all hours of work "in accordance with this agreement"; to select, hire, assign, lay off, transfer and promote employees "in accordance with this agreement"; to prepare and make available job descriptions and establish job classifications "thru bargaining with the Union"; to make, revise and modify "reasonable rules" governing the conduct of employees "as the Cooperative deems

necessary"; and to discipline and discharge employees for "just cause" (art. 6);

- The proposal also contained provisions which, among other established a new three-step grievance procedure, which allowed 15 calendar days to submit the written grievance at both the first and second steps, and provided for final and binding arbitration at the third step (art. 7); and
- provided that the Union could designate "a reasonable number of stewards" to represent the Union and the unit employees in disputes under the contract, who would be allowed "reasonable and sufficient time" to perform their steward duties without loss of pay or benefits (art. 5).

The proposal also contained provisions which, among other things:

- established a 4/10 employee work schedule, i.e., four days a week (Mon.–Thurs., or Tues.–Fri.), 10 hours per day between 6:30 am and 5 pm., except on holiday weeks (art. 8);
- prohibited strikes, stoppages, and lockouts (art. 2); and
- incorporated several provisions from CEC's existing employee manual, including those covering equal employment opportunity (art. 13), employee travel expenses (art. 15), and paid time off, including holidays, vacations, sick leave, and other types of leave (art. 16).

The Union also attached some proposed changes to certain provisions in the CEC employee manual. For example, consistent with article 6 of its contract proposal, the Union proposed changing section 5.26 of the manual, which gave CEC unfettered discretion to discipline and discharge employees, to substitute "just cause" language. The Union also proposed certain changes to various other personnel documents applicable to the linemen.[12]

About 10 days later, on October 7, the Union filed its initial unfair labor practice charge against CEC. The Union also filed additional, amended charges in late October and mid-November, and again in mid-January 2021. The charges alleged that CEC had bargained in bad faith in various ways, including by not scheduling sufficient sessions or providing dates, not providing its negotiators with authority to enter binding agreements, and by recording the September 25 session over the Union's objection. They also alleged that CEC had refused to provide information and to bargain regarding the

---

bargaining. *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958). Thus, unlike with respect to mandatory subjects, a party may not insist to impasse on such subjects. As discussed, infra, the Union's assertion that recording the bargaining session was a permissive/nonmandatory subject was correct.

[12] Jt. Exhs. 1 (Union's Sept. 25 proposed contract), 2 (Union's proposed ground rules); GC Exh. 2; R. Exh. 8; Tr. 35–37, 68–71, 142, 165–166, 174–177, 278–281, 312, 328–329. Regarding the amount of the Union's proposed wage increases for the apprentice and journeymen linemen, compare CEC's subsequent wage proposal (Jt. Exh. 3, art. 23), which lists the linemen's wages as of January 1, 2020; and Martinez' testimony (Tr. 312, 377–385, 495–497) discussing the Union's proposal and subsequent wage increases CEC implemented in February 2021.

discipline or discharge of the linemen.[13]

In the meantime, on November 2, the Union sent another email to CEC again asking it for additional dates to meet and bargain. However, CEC declined, stating, "In light of the pending unfair labor practice charges that have been filed over bargaining, it is probably best to have your lawyer speak with our lawyer about any continued negotiations." And CEC did not meet with the Union through January of the following year while the charges remained pending with the NLRB.[14] Nor did it submit a written counterproposal to the Union's September 25 proposed contract during that time.[15]

*B. The Next 3 Months (February through April 22, 2021)*

As indicated above, the Union and CEC eventually executed a nonadmission informal settlement of the unfair labor practice charges in late January 2021. CEC agreed not to bargain in bad faith in the manner alleged in the charges or to refuse to provide the Union with relevant and necessary information. It also affirmatively agreed to bargain in good faith with the Union generally, and to provide disciplinary records the Union had requested on April 2 and July 1 and 27, 2020 specifically.[16]

Over the next 3 months, the parties met for two more bargaining sessions, on February 26 and April 16. Like the initial session 5 months earlier, both were held on a Friday because CEC would not release Munoz to attend sessions on his workdays. Both sessions were also again conducted and hosted by CEC over Zoom. Martinez, Long, and Morris attended the sessions for CEC, and Strand, Fitzgerald, and Munoz attended for the Union.[17]

February 26 Session

At the beginning of the February 26 session, CEC emailed its initial contract proposal to the Union.[18] The proposal, which had been approved by CEC's board of trustees a few days earlier, differed substantially from the Union's proposed contract. It

was for a longer, three-year term (Jan. 1, 2021–Dec. 31, 2023). It also contained more articles (32). And except for those the Union had incorporated from CEC's employee manual, the provisions differed significantly from those in the Union's proposal. For example, with respect to union membership and dues, CEC's proposal:

- stated that employees "may voluntarily become or remain members of the Union" (art. IV), i.e., it did not require them to pay dues and fees as a condition of employment; and

- did not include a dues checkoff provision.

Regarding wages and benefits, the proposal:

- increased wages three percent in the first year and two percent in the second and third years of the contract (art. XXIII);

- ● stated that CEC could require an employee to work overtime, without any accompanying obligation to equalize overtime among employees (art. XII); and that CEC would pay time and a half for holiday work and double-time for after-midnight work until the employee received a 6-hour rest period (art. XIII);

- stated that CEC would pay employees one hour of pay while on call and two hours of pay if it was on their day off or a holiday, and did not require CEC to rotate or limit on-call status or pay employees any amount for using their personal cell phone (art. XIV);

- stated that CEC could require employees to perform other work during inclement weather but did not prevent CEC from reducing their weekly earnings because of inclement weather (art. XIX); and

- maintained existing benefit plans but with percentage caps on employer contributions to the retirement and 401k plans ("18%" of the employee-based wage to the retirement plan and "1%" of employee base wages for the 401k plan), and percentage caps on employer contributions or payments for employee healthcare premiums (no cap [100%] for individual coverage and "80%" for dependent coverage in 2021, which decreased in 2022 (95/75) and 2023 (90/70) thereby increasing the employees' percentage) (art. XXI).

Regarding management rights, the proposal:

- contained a management rights provision (art. VI, sec. 6.1) stating, among other things, that CEC "retain[ed] all of the powers, rights, functions and authority to manage [its] operations and affairs, [and] to hire, assign, layoff, discharge, promote and direct the workforce, "except to the extent to which they are specifically limited by an express provision of this Agreement"; and that "nothing herein shall be construed to limit" CEC's right "to determine the character, extent or methods of its operations . . . includ[ing]

---

[13] Tr. 37, 43, 47, 329. The Union's charges (21–CA–267344 and–267345) were not offered into evidence. However, I have taken administrative notice of them. See *Farmer Bros. Co.*, 303 NLRB 638 n. 1 (1991), enfd. 988 F.2d 120 (9th Cir. 1993).

[14] GC Exh. 13; Tr. 72–73, 177, 256–257. As before, the emails were between Strand and Long, CEC's attorney.

[15] Tr. 379, 440–441, 455–456. Martinez testified that he began drafting a counterproposal shortly after the September 25 session, and that he submitted a "sixth draft" to the NLRB in late 2020 in response to the Union's charges to demonstrate that CEC was prepared to bargain. However, he admitted that he did not send the draft to the Union. (Tr. 330–332, 379, 441.) And there is no evidence he sent any of the previous drafts to the Union either.

[16] GC Exh. 29. The record indicates that CEC provided the Union with some of the requested disciplinary information after the charges were filed. The remaining information, which is specifically listed in the settlement's notice to employees, was not provided until after the settlement was executed. See Tr. 258–263.

[17] R. Exhs. 9–14, 19, 20; Tr. 46–47, 68, 82–83, 147, 163, 232–233, 256–267, 452, 479, 482–487. See also GC Exh. 19. It is unclear from the record if Munoz attended the April 16 session.

[18] The proposal is identified as the "seventh draft." See GC Exh. 5. But, as noted above (fn. 15), it is the first draft sent to the Union. It is also the first draft in evidence; the sixth and prior drafts were never introduced. And there is no other evidence how it differed from them.

. . . the right to . . . schedule hours, overtime and shifts, [and] to discipline and discharge employees "for just cause";

- also contained a separate "recognition" provision (art. III, sec. 3.2) that stated, without any qualification or limitation, that CEC "retain[ed] all of the powers, rights, functions and authority" to "layoff, discharge, transfer, promote and direct the workforce"; to "schedule hours, overtime and shifts, transfer between operations centers, [and] to discipline and discharge employees," and that "nothing contained herein shall be interpreted to prohibit the contracting out of line construction or maintenance work"; and

- also contained a separate discipline provision (art. X, sec. 10.2) that incorporated language in CEC's employee manual (which the Union had proposed deleting) stating that CEC could impose disciplinary sanctions, up to and including discharge "for any . . . reason determined to be in the best interests of the Cooperative"; that "to the fullest extent permissible" employment was "at will"; and that CEC could "impose, modify or terminate any or all conditions of employment and . . . terminate any employment relationship, benefit or compensation for no reason or for any reason the Cooperative determines to be desirable, with or without notice or cause."

The proposal also included the following additional provisions specifically addressing discharge:

- a provision (art. IX) that identified approximately 10 types of conduct that the Cooperative "may" discharge an employee for (sec. 9.1), also listed 8 types of conduct that "will" result in "immediate termination," including "any . . . serious infraction" (sec. 9.2), and stated that "any disciplinary action, demotion, suspension or termination shall be deemed final" (sec. 9.3);

- a provision regarding the introductory evaluation period (art. XVI), which incorporated language in CEC's employee manual stating that successful completion of that period did not guarantee continued employment or imply that CEC waived or relinquished the right to terminate the employment "with or without cause, warning, or notice."

Regarding grievances and union representation, the proposal:

- contained provisions (art. X, sec. 10.4) incorporating the existing grievance procedures in the employee manual, which required the employee to submit a written complaint within two workdays after the occurrence or denial by the supervisor, and provided that the general manager's decision would be final and binding, i.e., it did not provide for arbitration; and

- also contained provisions (art. V) stating that the Union could appoint only one steward, who would perform his duties outside of normal working hours "to the extent practicable," but would be allowed a "reasonable time, paid by the Union," to fulfill his obligations regarding employee matters or grievances.

The proposal also contained provisions:

- stating that an employee's normal 40-hour workweek would be scheduled "at the discretion of the Manager"; that CEC could "temporarily restructure" it "to accommodate certain project schedules"; and that nothing in these provisions constituted a guarantee or limitation on the number of hours per day or days per week assigned to any employee (art. XI); and

- likewise prohibiting strikes, stoppages, and lockouts, but also requiring the Union to "guarantee" that it would "support the Cooperative fully in maintaining operations in every way possible" (art. XXXI).

CEC summarized the proposed contract for the Union, noting which articles from the Union's proposal were or were not included. It also briefly discussed several of the provisions, including wages and benefits. CEC notified the Union that the proposed three percent wage increase for 2021 had already been granted for nonunit employees and that CEC was prepared to grant it to the unit employees as well as an "act of good faith." However, CEC advised that it anticipated continuing increases in healthcare costs and that there needed to be some "offset of risk" going forward. The session ended shortly after as the Union requested more time to review CEC's proposal before responding to it.[19]

The following week, on March 1, the Union emailed CEC to advise that it tentatively agreed to four of the articles in CEC's proposed contract: art I (basic statement of agreement), art. XV (EEO), art. XVII (employee travel expenses), and art. XVIII (paid time off). The last three of these were from the CEC employee manual and had been included in the Union's initial proposal as well. Consistent with its previously proposed ground rules, the Union also attached signed and dated TAs on each of the four articles for CEC's signature.[20]

CEC responded on March 5. CEC thanked the Union for providing the four items it agreed with. However, CEC declined to sign any of the TAs, reiterating that it would not "engage in piecemeal bargaining as one area of the contract may affect others." It also stated that it would be helpful to get the Union's comments on the entire contract before meeting again.

The Union replied by email on March 8. The Union stated that it had provided CEC the articles it was "ready to tentatively agree to," and that "the rest" of CEC's proposed articles indicated CEC wanted "a Management dominated unrestricted

---

[19] Jt. Exh. 3; R. Exh. 19; Tr. 310–311, 377–378, 381–383. Martinez testified that the parties spent the first half of the meeting discussing the Union's September 25, 2020 proposal, and that CEC's proposal was not emailed to the Union or discussed until after this (Tr. 368–370). However, this testimony is inconsistent with both Morris's bargaining notes, which indicate that Martinez began the meeting by discussing CEC's proposed contract, and Long's 9:08 am email sending CEC's proposed contract to Union.

[20] Jt. Exh. 4; Tr. 76.

contract" and needed to be worked on. The Union identified, "for a start," the grievance and discipline processes as two items that needed to be "discussed." The Union said it was "ready to meet" regarding these and other subjects.

CEC responded shortly after. CEC said it was helpful to understand those areas where the parties were "currently in agreement" but repeated that it would not engage in "piecemeal bargaining." Regarding the Union's comment that its proposal appeared "Management dominated," CEC said its "interest was in providing clarity and direction so everyone is clear about the rules and expectations." As for grievance and discipline policies, CEC suggested providing "acceptable" proposals in those areas from the Union's viewpoint so that there would be "something concrete to discuss" at the next meeting.

The Union replied a few hours later. The Union explained that employees were concerned about disparate treatment and that CEC's discipline and grievance proposals did not mention "just cause" or provide any reasonable method for redressing complaints. The Union asked what CEC's "problems" were with a grievance process that ends in final and binding arbitration. Regarding TAs, the Union explained that it was hard to bargain without understanding what had been agreed to and asked if CEC's proposal was a "take it all or reject it all offer."

CEC responded on March 15. CEC denied that its proposed agreement was a "take it all or reject it all" proposal. CEC explained that it merely wanted the Union's position or comments before meeting to make for a more productive session and to understand where there is agreement. However, CEC did not explain what its problems were with final and binding arbitration.[21]

April 16 Session

The parties subsequently agreed to hold their next bargaining session on April 16. In the meantime, absent any objection from the Union, CEC granted the unit employees the same three percent wage increase that it had previously granted to nonunit employees and included in its February 26 proposed contract for 2021. In addition, two days before the meeting, CEC emailed the Union an amended proposed contract that moved the starting date for the 3-year contract to January 1, 2022. CEC's email explained that this reflected "the more likely timeline" given the "very little progress" in negotiations to date.

CEC's April 14 amended proposal also made various other, unexplained changes to its February 26 proposal. Specifically, CEC's amended proposal:

- added a new section 3.5 to its proposed recognition provision (art. III), stating that CEC retained "all inherent common law management functions and prerogatives" not waived in the agreement;

- modified its proposed union-representation provision (art. V) to require the steward to perform his duties "outside normal work hours";

- modified its proposed wages provision (art. XXIII) to reduce the wage increase in each year of the contract

to one percent;

- modified its proposed healthcare benefits provision (art. XXI) to maintain a 100/80 percent CEC contribution rate for individual and dependent coverage through 2022 (the new first year of the amended proposed contract) and to move the previously proposed reductions out to years 2023 and 2024 (instead of 2022 and 2023); and

- modified its proposed 401k benefits provisions (art. XXI) to lower the cap on CEC's 401k contributions from "1%" to ".01%" of the employees' base wages.[22]

The parties discussed these CEC amendments and other provisions in their competing proposals at the April 16 session.

*Contract term.* CEC said it proposed a 3-year term because the parties would be in "perpetual negotiations" if the contract was only for one year as the Union proposed. However, the Union did not agree to CEC's proposed 3-year term. Nor did it agree to CEC's amended proposal to move the starting date of the contract out to January 1, 2022.[23]

*Management rights.* The Union asked CEC to explain why its amended proposal added the new section regarding common law management rights. CEC said it wanted to clarify that such rights were not being waived just because they were not spelled out in the agreement. The Union disagreed with the addition, asserting that it appeared to expand CEC's management rights.[24]

*Discipline and grievances.* The Union objected to CEC's proposed article on discipline and grievances because it permitted CEC to have final say over both. The Union told CEC that the provisions effectively deprived the employees of representation with respect to such matters; that no self-respecting union would agree to them; and that they were unacceptable.

CEC indicated that it was willing to have a "just cause" standard for discipline. However, CEC insisted that its general manager retain the final say regarding both discipline and other workplace disputes; that it was unwilling to give the final decision on such matters to an arbitrator. CEC also objected to the Union's contrary proposal because it did not include any definition of "just cause" or other provisions that would give an arbitrator guidance.[25]

*Union representation/stewards.* CEC said its initial proposal limited the Union to one steward because there were only seven unit employees and the business would be disrupted if additional employees performed steward duties during work hours. As for its amended proposal, CEC said it went further and prohibited even one steward from performing steward duties during work hours because there likely would be disputes over what constitutes a "reasonable and sufficient time" to perform them

---

[21] GC Exh. 14–15; R. Exh. 15; Tr. 76–77.

[22] Jt. Exh. 5; Tr. 78, 377, 497. CEC's April 14 amended proposed contract also highlighted in yellow the four articles in the table of contents that the Union had agreed to.

[23] Tr. 78–79, 386–387.

[24] Tr. 183, 387.

[25] Tr. 74–76, 178–181, 192–193, 196–197, 292–295, 342–346. See also GC Exh. 19.

during work hours.

The Union disagreed with both proposals. The Union asserted that they would make it administratively impossible to effectively process grievances, particularly within CEC's proposed 2-workday time limit, as the linemen's reporting locations, Deming and Animas, were many miles apart and the supervisors would not be present during nonwork hours.[26]

*Wages.* The Union objected to CEC's amended proposal to reduce the annual wage increases to one percent. CEC explained that it reduced the wage increases from the prior proposal for two reasons. First, because it had granted the unit employees the proposed three percent wage increase for 2021 in the interim. Second, because the April 14 amended proposal now moved the starting date of the contract to January 1, 2022 and extended CEC's current 100/80 percent contribution rate for employee healthcare premiums through the end of that year, which given expected continuing increases, would increase CEC's costs of providing such benefits. CEC asserted that, when the wages and benefits in the amended proposal were considered together, there was no significant reduction in the total employee compensation it was offering.[27]

*401k contributions.* The Union objected to CEC's amended proposal to lower the cap on CEC's 401k contributions from "1%" to ".01%" of the employees' base wages. CEC insisted that there was no difference in the numbers; that they meant the same thing.

*Safety.* Unlike the Union's proposal, CEC's proposal included an extensive article on safety, including sections addressing drug screening and testing, clothing and personal protective equipment, vehicle use, cell phone usage, and discipline for violations, accidents, and collisions (art. XXV, secs. 25.1–25.14). The parties spent some time discussing several of these sections but did not reach agreement on them.[28]

### C. The Remaining Months (Since April 22, 2021)

Over the next 8 months, the parties met for nine more bargaining sessions, on June 18, August 6, 7, and 13, October 2, 15, and 29, November 20, and December 4. All were held on a Friday or Saturday when Munoz was neither working nor on-call. All were also again conducted and hosted by CEC over Zoom. And the same individuals attended except that Office Manager Rachel Marrufo also attended most of the sessions for CEC, along with or instead of Morris, to help take notes.[29]

#### June 18 Session

Both parties emailed each other some additional proposals after the April 16 session. CEC emailed the Union another amended proposed contract on April 28, and the Union emailed CEC some additional revised articles on June 17.

CEC's April 28 amended proposal:

- revised its proposed benefits article (XXI) to state that CEC would pay "100%" of health and medical

plan premiums for both individual and family coverage in all three years of the agreement, but with fixed caps ($850 for individual only and $2070 for individual plus family) thereby requiring the employee to pay any additional amounts; and

- also revised the benefits article to state that the existing retirement plan would "become a part of this contract and there will not be any future changes unless the changes are required by law or the plan Underwriter."

CEC's email did not explain why it had revised the benefits article in these respects, other than to note that no information or comments regarding CEC's prior proposals had been received from the Union since the April 16 bargaining session.

The Union's subsequent June 17 proposals:

- modified its initial proposal (art. 18) to delete the language preventing CEC from reducing employees' weekly earnings due to inclement weather, and to otherwise match the language in CEC's proposed article XIX on the subject.[30]

- "counter[ed]" CEC's proposal regarding union stewards by modifying the Union's initial proposal (art. 5) to provide that the Union would appoint no more than three stewards, but retained language stating that stewards would be allowed reasonable and sufficient time to perform their steward duties without any loss of pay or benefits;

- "counter[ed]" CEC's proposal regarding the introductory period by adding, "During this introductory period none of the provisions of this agreement shall apply except that hours of work and rates of pay, including overtime shall be based on this agreement," and deleting CEC's proposed language giving CEC the right to terminate employees who successfully completed the introductory evaluation period "with or without cause, warning, or notice."

The parties discussed these amendments and counters, as well as other provisions in their proposals, at their next session the following day.

*Inclement weather.* The Union confirmed that it was agreeing to CEC's proposed article on inclement weather.

*On-call pay and call-out pay.* The Union also agreed to CEC's proposed article XIV regarding on-call pay and call-out pay

*Benefits.* The Union did not agree to CEC's April 28 amended proposal regarding benefits.

*Union representation/stewards.* CEC did not agree to the Union's June 17 counter regarding stewards. It argued that three stewards would still be half the unit and the phrase "reasonable and sufficient time" was ambiguous and lacked any monitoring mechanism.

*Introductory period.* CEC also did not agree to the Union's

---

[26] Tr. 79, 183–184, 290–292, 387–388, 493. According to Google maps, Deming and Animas are 75 miles apart.

[27] Tr. 80–81, 184–185, 377–385, 388–389.

[28] R. Exh. 20; Tr. 80–81, 184, 484, 489–491.

[29] Tr. 46–47, 256–257. See also GC Exh. 19. Office Manager Marrufo's notes indicate that Munoz did not attend the session on August 7.

[30] Although identified as a "counter," the proposal was identical to CEC's inclement weather proposal.

June 17 counter regarding the introductory period. CEC argued that it was unacceptable because employees were not part of the unit during the introductory period.

*Management rights.* The Union again objected to CEC's previous, April 14 amended proposal adding a new section 3.5 on common law management rights. The Union argued that it expanded CEC's management rights and constituted "regressive bargaining." CEC responded that the addition was the "evolution of bargaining."

*Discipline and grievances.* The Union also repeated its objections to CEC's February 26 proposal giving management the final say on discipline and grievances without any provisions for binding arbitration as in the Union's prior proposal. CEC told the Union to submit a counter to the February 26 proposal and they would discuss it.[31]

### August 6 Session

About 6 weeks later, on August 2, CEC emailed the Union another amended proposed contract. The amended proposal:

- added a new section 3.6 to its proposed recognition article stating, "Neither the Union or [sic] Employer through their officers, members, representatives, agents, shall engage in any subterfuge of any kind for the purpose of defeating or evading terms of this Agreement";

- added a new section 4.2 in its proposed article on union membership stating, "Non-Coercion of Employees—The Union and its agents, shall not coerce employees into membership in the Union and shall not solicit membership in the Union during the working hours of any employee";

- also added a new section 4.3 in the same proposed article stating, "The Union agrees that neither it nor any of its officers or members will intimidate or coerce employees into membership in the Union. If any dispute arises as to whether there has been any violation of this pledge, it shall be handled in accordance with the Disciplinary [sic] outlined in this agreement"; and

- added a new section 13.2 in its proposed article on overtime rates of pay stating, "Overtime not to be offset by compensating time off. Employees who have worked overtime shall not be given time off without pay on a regularly scheduled workday to equalize overtime."

Again, there had been no prior discussion with the Union regarding the amended proposal, and CEC's email did not explain the reasons for it.

The following day, August 3, the Union emailed its own revised proposed contract to CEC. The Union's proposal revised its initial September 25, 2020 proposed contract and subsequent June 17 counters by:

- lengthening its proposed contract term from

one year to two years following ratification;

- reducing its proposed number of union stewards from three to two;

- reducing its proposed wage increases by $1.07–$1.53 in the first year, and proposing a five percent increase ($1.26 to $1.80) in the second year of the contract;

- deleting its proposed additional language stating that hours and wage rates for introductory employees would be based on the contract; and

- substituting CEC's proposed statement of agreement and article on inclement weather, which the Union had previously agreed to, and highlighting them and the other CEC articles from the employee manual it had likewise previously agreed to regarding EEO, employee travel expenses, and paid time off, to confirm that the Union had agreed to those provisions.

CEC responded by email on August 5. It objected to the format of the Union's August 3 proposals—that they were presented as revisions to the Union's proposed contract rather than revisions to CEC's proposed contract—asserting that the parties should continue negotiating "based on the Cooperative's comprehensive agreement." It argued that negotiating from the Union's proposed contract would "certainly set the negotiations back" and was "likely to result in piecemeal bargaining" as it did "not include all mandatory subjects of bargaining."[32]

The Union replied shortly after. The Union explained that its August 3 revised proposed contract was a "counter" to CEC's August 2 amended proposed contract, which the Union asserted was an "expansion on" the Cooperative's original and subsequent proposals. The Union also disputed CEC's assertion that the parties had been bargaining based on the Cooperative's proposed contract, as it had "not agreed to that at any point."[32]

The parties continued to discuss the matter when they met for their next session the following day. They agreed to look at both of their proposed contracts to determine what was mandatory or permissive and what could be agreed upon and "merged" or "combined."

The parties then went through and discussed a number of the articles in each proposal. And they reached agreement regarding the following three subjects.

*Dues checkoff.* CEC asserted that the Union's proposed dues checkoff provision was a permissive subject of bargaining,[33] and the Union agreed to remove/withdraw the provision.

---

[31] Jt. Exhs. 6, 7; GC Exh. 19; R. Exh. 21; Tr. 185–186, 391–397, 442. Regarding on-call pay and call-out pay, see Tr. 202–204, and Jt. Exh. 10, discussed infra.

[32] Jt. Exhs. 8, 9; GC Exh. 16; Tr. 85, 186, 188.

[33] CEC's assertion that dues checkoff is a permissive subject was incorrect. It is well established, "[p]ursuant to Board and court decisions, [that] dues checkoff is a matter related to 'wages, hours, and other terms and conditions of employment' within the meaning of the Act and is therefore a mandatory subject for collective bargaining." *Tribune Publishing Co. v. NLRB*, 564 F.3d 1330, 1333 (D.C. Cir. 2009). See also *CJC Holdings, Inc.*, 320 NLRB 1041, 1046 (1996).

14    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Introductory period.* The parties agreed on provisions that did not include either the Union's previously proposed language stating that hours and wage rates for introductory employees would be based on the contract, or CEC's language in its initial proposal allowing management to terminate an employee who successfully completed the introductory evaluation period "with or without cause, warning, or notice."

*Light duty.* The Union agreed to CEC's proposal on light duty (art. VIII), which gave management discretion whether to provide temporary light duty work to an employee and limited the duration.

The parties also discussed but did not reach agreement on several other subjects, including the following.

*Management rights.* The Union objected to CEC's proposal because it contained "doublespeak" and gave management authority to unilaterally change too many policies. CEC objected to the Union's proposal because it attempted to restrict and limit management's "inherent" rights and included too many broad and undefined terms.

*Discipline and grievances.* The Union repeated its objection that CEC's proposal gave the general manager final say over discipline and grievances with no provision for any type of arbitration. CEC said that it would "consider" agreeing to arbitration; that it was "researching" mediation "as a resolution alternative"; and that it had not "closed the door" on this. However, it said the time periods for filing and processing grievances in the Union's proposal were too long. The Union said it was open to reducing them.

*Working hours and work week.* CEC said it would not agree to the Union's proposal to "narrow" the normal workweek (Mon.–Thurs, or Tues.–Fri.) as it would expose the Cooperative to additional financial obligations.

*Commercial driver's license.* The Union took issue with CEC's proposed article XXII regarding CDL licenses because it required the linemen to pay for all costs associated with their license and required physical examination. The Union asserted that CEC was the only employer that did not pay these costs. CEC responded that it could include the costs in its analysis of total employee compensation costs.

The parties also discussed CEC's August 2 amendments/additions. The Union argued that there was no justification for the proposed new sections 3.6, 4.2, 4.3, and 13.2. The Union argued that the term "subterfuge" in 3.6 was vague, and that the conduct prohibited in the other sections was covered by federal law. CEC responded that the additional sections were needed to satisfy the Cooperative's concerns. As an example of "subterfuge," it cited an employee "slow-walking" his work. The Union replied that the amendments expanded on CEC's earlier proposals and were unacceptable.[34]

---

[34] R. Exhs. 26 (notes of Aug. 6 session), 27 (notes of Aug. 7 session summarizing Aug. 6 session); Tr. 85–86, 186–189, 292–295, 398–399, 470–471. At the hearing, Martinez testified that he added section 4.2 because it "came to my attention that union personnel were going to nonunion personnel at their workstations and talking to them about the Union during company time," and section 4.3 because "we had some new hires and [we wanted to] make sure nobody was being intimidated into joining the Union" (Tr. 399). However, it is unclear if he specifically expressed these concerns to the Union.

## August 7 Session

The parties met again the next day. CEC began by reviewing and summarizing the previous day's discussion. The parties then discussed the following subjects.

*Safety.* CEC suggested starting with its proposed article XXV on safety. The Union agreed to a couple of the sections in the article in whole or in part. However, it objected, expressed concerns, and/or requested more information about other sections. A question also arose about proposed section 25.5. The section stated that CEC would provide 11 flame-retardant shirts and pants to the linemen, but CEC advised that it had recently reduced the number it provided from 11 to 9. CEC explained that it had done so because it recently switched to a different laundry service and reduced the number under the new service contract to reflect that the linemen were now working four rather than five days a week. The Union said it would oppose changing from 11 to 9.

*Discipline.* There was also some discussion of discipline in the context of the safety article; specifically, provisions in the article specifying levels of discipline for certain rule violations (e.g., locking company vehicles) and vehicular accidents and collisions. The Union objected to the provisions, stating that it was "never in favor" of "predetermined discipline." CEC said there needed to be some guidelines for employees to understand and reference. The Union said it would "take a shot" at revising the language.

*Seniority.* The session concluded with a brief discussion of seniority. The Union raised the subject, noting that it was addressed in article 17 of its proposal but not in CEC's proposal. CEC said the Union's proposed article did not serve any purpose because it just defined the types of seniority (job and company) and when it would terminate (when the employee quits, is discharged for just cause, etc.), and there was no reference to it in any of the other articles of the proposed agreement.[35]

## August 13 Session

The parties met again a week later and discussed the following subjects.

*Working hours and workweek.* The parties continued their previous discussion of working hours and work week. CEC acknowledged that the linemen had been working a 4/10 schedule for almost two years. However, CEC said it would not agree to the Union's proposal to limit or impede management's flexibility to change the schedule, which it believed was just a mechanism to create more overtime periods. CEC asked the Union if they were at impasse on the subject. The Union said no, they needed to work together on language that they could agree on.

*Discharge and suspension.* The parties then discussed CEC's proposed article IX on discharge and suspension. CEC said the listed examples of conduct warranting termination were intended to define egregious behavior. The Union objected to the first example ("willful disregard of, or refusal to comply with, . . . rules or proper order of instruction") because an employee might do so for safety reasons, and the last ("any

---

[35] R. Exh. 27; Tr. 95, 358, 461, 471.

other serious infraction") because it was vague and could include anything CEC wanted. The Union also objected to the last section of the article stating that any disciplinary action, including discharge, "shall be deemed final."

CEC said it would "look at" the safety issue. However, it argued that all discipline "has to" conclude and be deemed final within the organization; that there was "no way" to conclude the disciplinary process external to the company; and that if the Union wanted to "appeal" a disciplinary decision it could file a charge with the NLRB.

*Benefits.* The parties then discussed benefits. CEC explained that its April 28 amendment added fixed numbers and caps on healthcare contributions over the 3-year contract term for budgeting and financing purposes. CEC said it could not agree to the Union's "maintenance of benefits" proposal (art. 21) as it placed all the risk of increased future costs of healthcare on the Cooperative.

The Union responded that its proposal was only for a 2-year period. It also again asked about CEC's April 14 amendment changing the 401k contribution cap from "1%" to ".01%". CEC again insisted that the numbers were the same, telling the Union to "Google it." However, CEC said it could put "1%" back in to make it clear. The Union said CEC should do so if that was its intent.

The parties then concluded the session with a discussion of the job description for journeymen linemen.[36]

### October 2 Session

About 6 weeks later, on October 1, CEC emailed the Union another amended proposed contract. The amended proposal continued to cap CEC's 401k contributions at ".01%" rather than "1%" as originally proposed in the benefits article. However, it:

- revised CEC's proposed section 25.5 in the safety article to reduce the number of CEC-provided flame-retardant shirts and pants from 11 to 9.

- struck through both CEC's own proposed article V regarding union representation/ stewards and the Union's proposed article 5 on the same subject (by striking through the article on an attached copy of the Union's table of contents), even though there had been no agreement between the parties that these provisions were nonmandatory/permissive or should be deleted/ withdrawn; and

- also struck through the Union's proposed article 17 on seniority (again, by striking through the article on the attached copy of the Union's table of contents), even though the Union had not agreed to delete/withdraw that article.

CEC also highlighted its amended proposal, both in the table of contents and the text, to indicate which articles the parties had agreed on (yellow), and which the parties had discussed but not agreed on (grey). However, the highlights were inaccurate in certain respects. For example, CEC highlighted in yellow

the last section of the discharge and suspension article, which stated that any disciplinary action "shall be deemed final," even though the Union had objected to and disagreed with it at the previous session. And CEC did not highlight in grey the articles regarding the contract term, benefits, or wages, even though they had previously been discussed.[37]

The parties met for their next session the following day. They discussed numerous articles and subjects, including the following.

*Union representation/stewards.* The Union immediately questioned why CEC had struck through the Union's article on union representation/stewards in the Union's table of contents. CEC responded that it considered the subject nonmandatory/permissive but would highlight the article in grey to indicate it was discussed but not agreed to.

*Union recognition.* The Union continued to object to CEC's proposed article on union recognition because it included management rights provisions. CEC said it would consider moving them to the management rights article. The Union also again objected to CEC's added section prohibiting any "subterfuge" to defeat or evade the contract because it was too vague. CEC said it meant "undermining" the contract. The Union asked how it would be enforced. CEC said the same way as other contract violations, through CEC's proposed grievance procedure with the manager's decision being final and binding.

*Union membership.* The Union said the first section in CEC's proposed article regarding "voluntary" union membership was not itself objectionable. However, the Union objected to the second section because it prohibited the Union from soliciting during working hours. And the Union said the third section was unacceptable because it gave the manager final and binding authority to impose discipline for violations.

*Discharge and suspension.* The Union stated that it continued to disagree with CEC's proposal regarding discharge and suspension. It objected to CEC indicating otherwise by highlighting it in yellow.

*Discipline and grievances.* CEC said it had "looked at" arbitration but it would require including a "matrix of discipline" and "expanding" it to bring "clarity"; otherwise, they would be "in a perpetual state of arbitration."

*Strikes, stoppages, and lockouts.* After some discussion, the Union agreed to CEC's proposed article XXXI on strikes, stoppages, and lockouts.

*Employment, demotion, and transfer.* The Union objected to CEC's proposed article VII on employment, demotion, and transfer because it made no provision for seniority. The Union said it would submit a counter to CEC's proposal.

*Wages.* The Union objected that CEC's proposed wage rates were "way too low," and offered to send CEC the consumer price index and some information on current line rates. The Union said it knew CEC was losing employees to another company (PNM) due in part to CEC's low wages. It also said that it knew CEC was using contractors that were compensated significantly more than the unit employees.

CEC responded that it considered total compensation, including benefits, in making its wage proposal, and that it was

---

[36] R. Exhs. 22, 28; Tr. 461–462, 485.

[37] Jt. Exh. 10; Tr. 88–100, 217–218, 302–303.

not as concerned as the Union about losing employees. As for using contractors, CEC said that, like other utilities and electrical cooperatives, it had been doing so for years. CEC said they were used for various reasons, such as to cover incremental increases in work due to storms and microbursts that take out poles and cause power outages, and short-term projects that the existing unit employees do not have the time to cover because of their regular work. CEC said it couldn't hire additional full-time employees for such incremental and short-term work because there wouldn't be enough work for them to do after that work was done. Finally, CEC said it did not have access to the contractors' payroll documents and was not privy to their employees' terms and conditions of employment. The Union replied that it would send CEC a written information request.[38]

### Union's October 4 Information Request

Two days later, on October 4, the Union emailed CEC a copy of the consumer price index showing cost of living increases by city and regional area, as well as charts showing the current average hourly line rates. The email also included the Union's request for information regarding CEC's use of contractors to perform unit work. Specifically, it requested "the number, classification and wage rates each of the contractors are filling that involves work being done that was formerly performed by Unit employees." It also requested "the business name of these contractors" and the number of workers "they have performing the work." The email indicated that the Union was requesting this information because, as discussed at the October 2 session, it had just become aware that CEC was employing contractors to perform unit work, and it understood that the contractors were paying a higher wage rate than the wage rates of the unit employees. The email requested that the information be provided no later than the next bargaining session on October 15.

CEC responded shortly after. CEC repeated that it "employs contractors on a regular basis and has done so for many years." CEC also stated that it had "not implemented a reduction in force resulting in the loss of jobs"; that it was "the sole and exclusive manager of its business," with "the rights and authority to manage its operations and affairs, including determining the character, extent or methods of its operation"; and that the requested information "is not relevant to discipline or contract negotiations." CEC therefore "denied" the information request.

The Union replied a week later, on October 11. The Union said the requested information was relevant to the parties' ongoing negotiations over wage rates. Based on CEC's response, it also indicated that the information was relevant to CEC's management rights proposal. The Union reaffirmed that it expected the requested information to be timely provided.

CEC responded shortly after. CEC agreed that the unit employees' wages were a mandatory subject of bargaining. However, it asserted that management rights and third-party contracts were not, and that CEC's third-party contracts had "no material impact" on the unit employees' wages, hours, or working conditions. CEC stated that the Union should consider this to be CEC's "final response" to the information request.

The Union replied shortly after. The Union stated that "increasing the unit employees is important to them," and the Union had "received feedback that the 'contractor employees' are making substantially more than that of the Cooperative employees." The Union asserted that the requested information was therefore "clearly relevant," and indicated that it would file an unfair labor practice charge with the NLRB.[39]

### October 15 Session

A few days later, on October 14, CEC emailed the Union another amended proposed contract. The amended proposal modified CEC's proposed article X on discipline and grievances in the following respects.

- The amended proposal modified the first sentence of section 10.2, which addressed management's right to impose disciplinary sanctions, to reference a "disciplinary matrix" that was attached as exhibit H to the proposal. The matrix, which had been approved by the CEC board of trustees, listed numerous "offenses" with corresponding "penalties" (verbal warning, written warning, four-day suspension without pay, or discharge) that "shall be imposed" "depending on the gravity of the offenses" (A-light, B-moderate, C-serious, or D-grave) and the number of times it had been committed. For example, the matrix indicated that the first grave offense would warrant discharge and listed 52 such offenses.[40] Whereas the matrix indicated that the first serious offense would warrant four days suspension without pay and listed 28 such offenses.[41] However, the amended proposal retained

---

[38] R. Exhs. 18, 23, 29; Tr. 157, 159, 234, 431–438, 462, 481, 485. The parties also discussed a number of other articles in CEC's proposal at the end of the session, including a savings clause, waiver clause, and articles on the scope of the agreement and captions and headings, but the Union did not agree to them. CEC also stated that it would withdraw, as duplicative, a proposed article on wage and price regulations.

[39] Jt. Exhs. 12, 13.

[40] Grave offenses listed in the matrix included, among other things, stealing, altering or falsifying a time record, circumventing any company policies or processes to favor oneself, breaching management's trust, disclosing restricted or classified information, dishonesty in any form, culpable acts or omissions causing damage to the cooperative's interest, violating the no-strike clause, insubordination, displaying bad manners such as the use of abusive or insulting language, fighting, harassment, carrying firearms on the premises or job site, drinking alcohol at work, using drugs, refusing to submit to a drug test, noncompliance with safety and security requirements, deliberately hiding a contagious disease, engaging in a romantic obscene relationship on cooperative time, failing to maintain a class A CDL driver's license, unauthorized use of a company vehicle, and an at-fault rear end collision.

[41] Serious offenses included, among other things, defacing any part of company property, improper use of company facilities or materials, illegal gathering by meeting for a lawful or unlawful purpose in a manner likely to impair the peace and tranquility of the organization, refusal to accept a change of work shift/area; uttering remarks, doing acts, or making gestures to a superior, libel or slander, rumor mongering by deliberately spreading malicious/false rumors against employees, officials, or guests concerning personal affairs, and sexual harassment/abuse. The matrix also provided that serious offenses would remain on the employee's record for 18 months before being

the language in article IX, section 9.2 stating that any "serious infraction" would result in "immediate termination."

- The amended proposal deleted the last sentence of section 10.2 stating that CEC could "impose, modify or terminate any or all conditions of employment and . . . terminate any employment relationship, benefit or compensation for no reason or for any reason the Cooperative determines to be desirable, with or without cause." However, it retained the second sentence stating that CEC could impose disciplinary sanctions, up to and including discharge "for any . . . reason determined to be in the best interests of the Cooperative." It also retained, and strengthened, the third sentence, which now stated that, "notwithstanding any language in this section or elsewhere in this agreement to the contrary, it is understood that, to the fullest extent permissible, employment with the Cooperative is 'at will.'"

- The amended proposal added a new section 10.3 titled "disciplinary appeal to the "Federal Mediation and Arbitration Service" [sic].[42]    The new section stated that an employee or the Union could "file a petition with [CEC] for mediation with the Federal Arbitration and Mediation Service" [sic] if dissatisfied with a final disciplinary decision that resulted in leave without pay or termination.  However, it stated that CEC had "discretion" to decline to mediate grave offenses. It also stated that the employee or Union would be "responsible for any and all fees incurred as a result of the appeal."   And it stated that management's decision would "remain in effect" if no agreement is reached after the parties have participated in good faith in the mediation process, i.e., it did not include any additional provisions for arbitration.

- The amended proposal modified the section describing the grievance procedure (now sec. 10.5). It added an opening sentence stating, "A grievance must be filed within 2 calendar days of the alleged event or action that is the basis for the grievance." It also modified and more fully described the first, "informal discussion" step of the internal grievance process, eliminating previous language limiting such discussions to the end of the workday. However, it retained the prior language describing the second and third steps, including that the general manager's decision "is final and binding," i.e., it likewise did not include any additional provisions for arbitration.

In other significant respects, CEC's amended proposal was substantively the same as the previous one.  For example, it still included section 3.5 stating that CEC retained all "inherent common law management functions and prerogatives" not waived in the agreement.  And the 401k provision still capped CEC's contributions at ".01%" rather than "1%."

The following day, at the parties' next bargaining session, the Union emailed CEC two additional proposals. The proposals:

- countered CEC's proposed article on employment, demotion, and transfer by, among other things, proposing that external candidates would be considered for vacancies only after internal candidates have been exhausted; that seniority would be the determining factor for filling vacancies and transfers if employees were otherwise equal; and that seniority would also prevail in layoffs and reductions in hours.

- countered CEC's proposed savings clause (art. XXVII) addressing what would happen if a portion of the agreement was invalidated.

The parties spent most of the October 15 session discussing their forgoing proposals.

*Discipline and grievances*.  The parties had a lengthy discussion of CEC's October 14 proposed changes to article X.  CEC said it revised the first sentence of section 10.2 and added the matrix to indicate what would constitute "just cause."  The Union objected to these changes because they significantly expanded CEC's prior proposals, listed numerous broadly worded and subjective examples, and set predetermined discipline without accounting for mitigating factors relevant to "just cause."  The Union indicated that it would submit a counter. The Union also rejected CEC's other changes to article X because they continued to give management the final say over both discipline and grievances.

*Employment, demotion, and transfer*.  CEC disagreed with the Union's counterproposal on employment, demotion, and transfer.  CEC noted that it might be looking for a different skill set, and that following seniority in reductions in force might require an employee to move.

*Healthcare insurance benefits*.  At the end of the session, CEC notified the Union that the insurance provider would be significantly increasing the costs of the current healthcare plan. CEC said it was working on proposals and investigating alternatives, and that it would discuss them with the Union during the next bargaining session on October 29.[43]

### Union's October 22 ULP Charge

A week later, on October 22, the Union filed the unfair labor practice charge in this case.  The charge alleged that CEC had refused to bargain in good faith over the previous 6 months in violation of Section 8(a)(5) and (1) of the Act by engaging in surface bargaining and regressive bargaining, and by refusing to provide requested information about contractors performing unit work.

---

"cleansed."  Moderate and light offenses would remain on the record for 15 and 12 months, respectively.

[42]  This apparently referred to the Federal Mediation and Conciliation Service (FMCS), which provides arbitration as well as mediation services.   See   29   CFR   Part   1404   and https://www.fmcs.gov/services/arbitration/.  However, other than misnaming FMCS, there was no mention of arbitration in CEC's amended proposal.

[43]  Jt. Exhs. 11, 14; R. Exh. 24; Tr. 102–104, 225–228, 424–428, 485–486.

18                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

October 29 Session

The parties met for their next session a week later, on October 29, and discussed the following articles/subjects.

*Healthcare benefits.*  The session began where the previous session ended, with a discussion of increasing healthcare insurance costs. CEC provided the Union with the results of its research into the available options and insurance providers. CEC said it had not reached a decision yet but was leaning toward renewing with the current provider as it was clearly the best choice notwithstanding the increase in costs.

CEC also advised that, in light of the increase, it was working on some more "preliminary amendments" to its last, April 28 amendment to the benefits article, which had proposed paying 100 percent of the premiums up to a fixed cap. CEC indicated that it had made those amendments because its other, nonunit employees had indicated they wanted the Cooperative to pay 100 percent of the health insurance and were willing to forgo any salary increase if it did so; however, the Union was seeking wage increases for the unit employees so there needed to be caps on CEC's contributions in order for there to be wage increases in the total compensation package, i.e., the caps on healthcare contributions were needed to "offset" wage increases.  CEC said it was "really indifferent" to how the Union wanted to "structure the economics"; but the Cooperative had a "bottom line" number.  The Union said it would wait to see what CEC did with the nonunit employees.

*Management rights, grievances, and discipline.*  The Union again objected to CEC's October 14 amended proposal on management rights, grievances, and discipline, asserting that it continued to provide that "management is right in all cases."  It asserted that "no self-respecting union" would agree to such a "ridiculous" proposal, and that no other union agreements existed with such an "onerous" management rights clause and grievance and discipline procedure.

CEC agreed but proposed that they "sit and talk about it." CEC explained that it was trying to "minimize conflict" by making it clear to employees what the offenses and penalties were.  CEC said that providing such "clarity" would "make mediation and arbitration an acceptable option"; that "arbitration will require clarity" and the Union's proposal was "just not detailed enough."  The Union replied that CEC was failing to consider what was "fair treatment"; that CEC's propose disciplinary matrix was "not reasonable" and would not give employees "a fair shot to begin with."

CEC disagreed.  It repeated that it was "not opposed" to binding arbitration "except that there needs to be equity when we get there"; "we need clarity and those kinds of things that make it work."  CEC said that at a future meeting they could "dissect" their competing proposals further and agree to some "common language." The Union responded that it had agreed to CEC's proposed language in a number of articles, but CEC had not agreed to a single Union proposal to date.

*Commercial driver's license.*  The Union stated that it tentatively agreed to CEC's proposed Article XXII requiring employees to pay for the costs of getting their CDL licenses.

The parties also again discussed the difficulty of scheduling sessions around Munoz's work schedule.  The issue came up during the discussion of healthcare insurance and again at the

end of the session.  CEC said it wanted to finish working through the entire agreement by the end of the year, and that it would send the Union Zoom invitations to meet every day excluding Sundays and holidays for the next 60 days if necessary to do it.  However, the Union reminded CEC that it would not allow Munoz to attend on days when he was scheduled to work or be on call.  The Union said it was difficult to meet without a unit member present.  CEC responded that this was "a Union issue."  The Union replied that it would be willing to pay Munoz's wages so he could attend.  However, CEC declined, saying there was no existing "provision" or "mechanism" for Munoz to attend other than taking 30 days leave without pay.[44]

November 20 Session

The parties met for their next session three weeks later, on November 20, and discussed the following articles/subjects.

*Healthcare benefits.*  CEC informed the Union that the Cooperative would be renewing with the current provider for the nonunit employees.  The Union said it expected CEC to maintain the status quo ante "to keep everything the same" for the unit employees until the contract was negotiated.

*Wages.*  The Union argued that CEC was currently at the bottom of the wage structure.  CEC responded that wages were only one component of compensation; that benefits were also part of compensation; and that the Cooperative was "no way near the bottom" when total compensation, including the Cooperative's defined benefit retirement plan, was considered. CEC said that if it increased wages, it would have to contribute less to benefits, and the Union was asking too much to still maintain the same level of benefits.

The Union also again argued that CEC was losing employees to other companies and was paying more to contractors.  CEC replied that some employees prefer higher wages rather than benefits.  Regarding contractors, it admitted that using them cost more, but said they were used for work that comes and goes and CEC's current workforce could not perform that work and still do their regular work, no matter what CEC paid them. The Union responded that if CEC paid more in wages, it could retain employees and not have to contract the extra work out. CEC said that was not realistic; that paying the unit employees more would not "magically" enable them to cover the extra work.

*Discipline.*  The Union stated that it was "working on" a discipline matrix to counter CEC's "expansive" one and should have it by the next session.  CEC responded that having a matrix was "fundamental to getting where you want to go, which is binding arbitration"; that "after some research," it was "not opposed" to binding arbitration "so long as there is sufficient clarity in the contract."  The Union replied that it did "not look at it in the same manner" CEC did; that CEC seemed to have an "exhaustive list of predetermined discipline" that "allowed no room for the supervisor to make a determination based on the specific situation."

CEC said it understood but needed to know if the Union was providing CEC "that sort of latitude" with "lower level discipline."  CEC said, "[S]o long as we are not finding ourselves in

---

[44] R. Exhs. 25, 30; Tr. 463, 481–482, 486.

binding arbitration in these situations, then [we're] good." The Union replied that it was not interested in arbitrating coaching sessions or other actions that were not written or formalized and had no negative consequences. However, the Union said it could not exempt from arbitration any discipline that would be placed in the employee's file. CEC said it understood.

The parties also again discussed the bargaining schedule and Munoz's availability. CEC said it had sent out Zoom invitations to meet "from here to the end of the year." The Union asked which of those days Munoz could be available. CEC replied that he could take "accrued time." The Union argued that all CEC had offered were days and times it knew the Union could not meet because Munoz could not be available. CEC told the Union to provide a list of dates and hours it was available if CEC allowed Munoz to take time off work without pay. The Union said it would do so in the next few days.[45]

### December 4 Session

The parties met for their next and final session about two weeks later, on December 4. In the interim, in light of the discussion at the November 20 session, the Union decided not to make a counter to CEC's disciplinary matrix. However, on the morning of the December 4 session, the Union did email CEC another counter on its proposed savings clause. As for CEC, it did not email the Union anything before the session except another copy of its October 14 amended proposed contract and the parties' respective tables of contents with updated highlights and strikethroughs (several of which remained incorrect).

The Union began the session (after again noting the incorrect strikethrough of its proposal on union representation) by listing the articles in CEC's amended proposal that it was rejecting. These included articles II (contract term), III (union recognition), IV (union membership), VI (management rights), VII (employment, demotion, and transfer), X (discipline and grievance), including exhibit H (the proposed disciplinary matrix), XI (working hours and work week), XII (overtime), XIII (overtime rates of pay), XXIII (wages), XXIV (apprenticeship training program), and XXIX (scope of agreement).

The Union also noted that its benefits proposal (art. 21) remained different than CEC's benefits proposal (art. XXI). The Union stated that it believed CEC had rejected that and all the other proposed articles CEC had highlighted in grey on the Union's table of contents. These included articles 1 (basic principles), 3 (recognition and maintenance of membership), 6 (management rights), 7 (grievance and arbitration), 8 (working hours and work week), 9 (overtime), 10 (overtime rates of pay), 11 (overtime meals), 20 (waiver clause), and 23 (wages). CEC said, "Yes, you can consider those rejected."

"So, at this point," the Union concluded, "it's time to call in FMCS." CEC responded that it would "declare an impasse if that's what you're saying." It asked for clarification, saying, "So at this point both parties have declared an impasse and all that goes with it, correct?" The Union said "yes," it was "aware of the implications." CEC told the Union to put it in writing. CEC said it would then "send an acknowledgment that we agree that we have reached an impasse." The Union agreed

and the session ended.

Two days later, on December 6, the union sent an email to CEC. The email did not specifically mention reaching an "impasse" at the last session. However, it stated that both parties had rejected any of each other's proposals that had not previously been accepted. It also added, "At this time the Union is unwilling to accept the rest of the Cooperative's proposals for the reasons we have previously stated and we will be contacting the FMCS agent."

CEC responded the following day. It described in detail its version of what was discussed on December 4. It asserted that the Union had said it believed the parties had reached an impasse and asked if CEC agreed with that assessment, which CEC did. It stated that, having bargained to an impasse, the parties were "now not legally obligated to meet and bargain further."

The Union replied a few days later, on December 10. It detailed its own version of what occurred at the December 4 session. It confirmed that it said there was no more movement and the parties were at impasse. However, it denied that CEC had bargained in good faith prior to the impasse, citing the bad-faith bargaining charges the Union had filed against CEC. (It also noted that CEC had filed bad-faith bargaining charges against the Union.) It also reminded CEC that the Union had discussed contacting FMCS to obtain a mediator.

CEC responded shortly after, stating, "The Cooperative acknowledges your communication confirming both parties declared an impasse at the December 4, 2021 negotiating meeting."[46]

## II. ANALYSIS

Sections 8(a)(5) and 8(d) of the National Labor Relations Act require employers to bargain with a duly elected or recognized union "in good faith." This means they must bargain with a sincere intent to enter into a collective-bargaining agreement. They may engage in hard bargaining to get the agreement they want—section 8(d) specifically states they are not compelled to agree to a union proposal or make a concession—but they may not bargain to avoid or frustrate the possibility of any agreement. See *Altura Communication Solutions*, supra, 369 NLRB No. 85, slip op. at 1 and cases cited there.

As discussed earlier, determining which strategy a respondent employer has chosen—lawful hard bargaining or unlawful bad faith bargaining—requires examining all the circumstances during the parties' entire course of negotiations. Here, as indicated by the General Counsel, there are a number of circumstances indicating that CEC was bargaining in bad faith.

### 1. Failing to timely respond to the Union's requests to begin negotiations

CEC repeatedly delayed responding to the Union's requests to begin negotiations. It did not respond for over a month to the Union's initial June 25, 2020 email requesting available dates to "start meeting to work out the details of a contract," and only after the Union sent a second request on July 29. Further, CEC's response at that time failed to provide any

---

[45] R. Exh. 31; Tr. 434, 463–464

[46] Jt. Exhs. 15, 16; R. Exh. 32, GC Exhs. 17, 18; Tr. 239, 464, 471–472.

20                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

available dates, but simply stated that it was not willing to meet "in person" due to the risk of COVID-19 infection.  And when the Union replied the next day, suggesting that they meet electronically and repeating its request for available dates, CEC again did not respond until well over a month later, on September 10, and only after the Union's attorney called and threatened to file an unfair labor practice charge.

CEC's posthearing brief (p. 5) blames the delay in scheduling the first session on "the COVID-19 pandemic and the difficulty in coordinating the initial bargaining session to ensure everyone's safety because of the New Mexico Governor's restrictions."  However, there is no record evidence that this was the reason for CEC's failure to timely respond in any way to the Union's repeated requests in June and July for available dates to begin bargaining.  CEC presented no evidence that it was unable during that period to timely receive and respond to emails and otherwise manage and operate the electrical cooperative and handle its personnel matters due to the COVID-19 pandemic.[47]  Nor did it introduce any evidence that General Manager Martinez, Attorney Long, and/or HR Supervisor Morris even considered any options regarding how and when to begin bargaining with the Union during that period.  In short, COVID appears to be just a "convenient excuse."[48]

In agreement with the General Counsel, therefore, I find that CEC's delay in responding to the Union's requests to begin bargaining is substantial evidence of an intent to avoid reaching any agreement.  See, e.g., *Kitsap Tenant Support Services*, 366 NLRB No. 98, slip op. at 5–8 (2018), enfd. per curiam 2019 WL 12276113 (D.C. Cir. April 30, 2019), and cases cited there.

2. Insisting to impasse on recording the first bargaining session

When the parties eventually did meet on September 25 to begin contract negotiations, CEC insisted on recording the session notwithstanding the Union's repeated objections and refusal to acquiesce in it.  The Board has long held that that such conduct "has a tendency to inhibit the free and open discussion necessary for conducting successful collective bargaining" and is therefore impermissible.  *Bartlett-Collins Co.*, 237 NLRB 770, 773 fn. 9 (1978), enfd. 639 F.2d 652 (10th Cir. 1981), cert. denied 452 U.S. 961 (1981). See also *Pennsylvania Telephone Guild (Bell Telephone)*, 277 NLRB 501, 501–502 (1985) (applying the same policy to grievance meetings).

Martinez testified that CEC insisted on recording the session because "the first several months of our interactions with [Union Assistant Business Agent] Mark Strand were very hostile," and "we felt that . . . recording the sessions would inject civility into the negotiations" (Tr. 279–280).  However, Martinez provided no details whatsoever regarding the previous interactions and his testimony was never corroborated by any other witness or evidence.  As previously noted, Attorney Long, who attended the session with Martinez and was the one who previously

communicated with Strand about scheduling meetings, did not testify.

Accordingly, I discredit Martinez's explanation. Based on the record as a whole, I infer and find that the true reason CEC insisted to impasse on recording was to disrupt the initial bargaining session and further delay the negotiations.[49]

3. Refusing to bargain pending resolution of the Union's ULP charges

Despite the clear Board precedent against its position on recording bargaining sessions, CEC declined the Union's request, shortly after it filed the initial October 22 charge, to provide additional dates to meet.  Nor did it submit a written counter-proposal to the Union's September 25 proposed contract.  It was not until months later, in late February 2021, after the Union's charges were settled, that CEC agreed to meet again and emailed a counterproposal to the Union.

This conduct was likewise inconsistent with longstanding Board precedent and further evinces CEC's intent to delay the negotiations and avoid reaching a contract.  See *Gagnon Plating & Mfg. Co.*, 97 NLRB 104, 111 (1951) ("The law is well-settled that filing of charges [does] not suspend the operation of the Act, nor relieve an employer of his duty to bargain," because otherwise "an employer might give lip service at the bargaining negotiations until a charge was filed and thereafter refuse to participate further in negotiations").  See also *Pine Manor Nursing Home*, 230 NLRB 320, 326 (1977), enfd. 578 F.2d 575 (5th Cir. 1978).

4. Making proposals that deprived the Union of its representational role

When CEC finally did make its first proposal in late February 2021, it included a number of predictably unacceptable provisions that essentially deprived the Union of its representational role.  For example, it included a provision (art. X, sec. 10.2) giving CEC complete discretion to "impose modify or terminate any or all conditions of employment" and "terminate any . . . benefit or compensation for no reason or for any reason the Cooperative determines to be desirable, with or without notice or cause."  It also included provisions (art. III, sec. 3.2; art. VI, sec. 6.1; and art. XI, secs. 11.1 and 11.3) that specifically or effectively gave CEC complete discretion over the number

---

[47] CEC does not contend that it was excused from bargaining altogether due to the pandemic under the "economic exigency" exception recognized in *RBE Electronics of S.D.*, 320 NLRB 80, 81 (1995).

[48] *In re Gabbidon Builders, LLC*, 2021 WL 1964544, *4 (W.D. N.C. May 14, 2021) (rejecting debtor's assertion in bankruptcy proceeding that its poor past performance could be entirely blamed on the COVID-19 pandemic).

[49] The General Counsel argues that CEC failed to cloak its bargaining representatives with sufficient authority at the September 25 session, citing Martinez's statement at the meeting that any proposals would have to be reviewed and approved by CEC's board of trustees. However, the GC cites no Board decisions finding that such a statement by itself established lack of sufficient authority to engage in meaningful bargaining.  Further, Martinez was not a low-level supervisor; he was CEC's executive VP and general manager.  And he was accompanied at the session by both Attorney Long and HR Supervisor Morris.  Cf. *WR Reserve*, 370 NLRB No. 74, slip op. at 1 n. 3 and 5 (2021) (finding bad faith where, among other things, the employer's sole bargaining representative was an administrative assistant who admitted at the first bargaining session that she didn't know why she was there and that she couldn't make any decisions), enfd. sub nom. *NLRB v. Noah's Ark Processors, LLC*, 31 F.4th 1097 (8th Cir. 2022).  In any event, given my findings that CEC's bad faith is established by other circumstances, it is unnecessary to decide whether Martinez's statement at the initial meeting likewise evidences CEC's bad faith.

of hours and days per week and amount of overtime assigned to employees (and thereby over their total compensation), as well as over layoffs and contracting out unit work.

In addition, although the proposal included a provision (art. VI, sec. 6.1) indicating that CEC could discipline and discharge employees "for just cause," another provision (art. X, sec. 10.2, above) stated that, "notwithstanding any language in this section or elsewhere in the written policies of the Cooperative to the contrary, . . . to the fullest extent permissible" employment is "at will."[50]  As with other terms and conditions of employment, the provision also specifically gave CEC complete discretion to "impose disciplinary sanctions, including discharge for any . . . reason" CEC determined was in its "best interests"; and to "terminate any employment relationship . . .  for no reason or for any reason the Cooperative determines to be desirable, with or without notice or cause."

Further, the proposal contained provisions (art. IX, sec. 9.3; and art. X, sec. 10.4) stating that "any disciplinary action, demotion, suspension or termination shall be deemed final," and that the general manager's decision regarding any grievances would likewise be "final and binding."  Thus, the proposal effectively precluded the Union from seeking independent review by an arbitrator of any disciplinary action or other workplace disputes or disagreements on behalf of the unit employees.

The proposal also included a broad no-strike clause that, not only barred the Union from calling any strikes or engaging in any picketing, patrolling, or boycotts, but also required it to "guarantee" that it would "support the Cooperative in maintaining operations in every way possible."  The proposal therefore also effectively prevented the Union from utilizing other lawful and traditional means to impose economic and public pressure on CEC with respect to workplace disputes or disagreements.

Moreover, notwithstanding the Union's objections, CEC continued thereafter to include these provisions in subsequent amended proposals.  It also added another one.  Its amended proposal in April added a provision (art. III, sec. 3.5) stating that CEC also "retained" "all inherent common law management functions and prerogatives which [it] has not waived in this Agreement."

It is well established that an employer's insistence on such provisions may evince an intent to avoid or frustrate reaching an agreement, particularly where, as here, there is also other indicia of bad faith.  See *Altura Communications Solutions*, supra, 369 NLRB No. 85, slip op. at 1–6; *Kitsap Tenant Support Services,* supra, 366 NLRB No. 98, slip op. at 8–10; and *Santa Barbara News-Press,* 358 NLRB 1415, 1417–1418, 1498–1500 (2012), reconsideration denied 359 NLRB 1110 (2013), reaffd. and adopted as modified 362 NLRB 252 (2015), enfd. per curiam sub nom. *Ampersand Publishing, LLC v. NLRB*, 2017 WL 1314946 (D.C. Cir. March 3, 2017) and cases cited there.[51]

It is true, as argued by CEC, that it eventually modified sections 10.2 and 10.4 of its proposed contract.  However, CEC did not do so until mid-October, 9 months and seven bargaining sessions after they were initially proposed.  Cf. *Houston County Electric Cooperative, Inc.,* 285 NLRB 1213, 1214 and fn. 6 (1987) (finding that the employer's proposals were an indication of bad faith even though the employer eventually withdrew them, given the number of bargaining sessions and amount of time required before it did so).  See also *Continental Insurance Co. v. NLRB*, 495 F.2d 44, 50 (2d Cir. 1974).

Further, the modifications were predictably inadequate to move the parties closer to an agreement.  For example, the most significant modification on its face was CEC's deletion of the last sentence in section 10.2 giving CEC the right "to impose, modify or terminate any or all conditions of employment and . . . terminate any employment relationship, benefit or compensation for no reason or any reason the Cooperative determines to be desirable, with or without notice or cause."  The actual significance of this change was limited, however, given the earlier addition of section 3.5, which CEC never withdrew or modified notwithstanding the Union's objections; the other provisions that CEC retained in sections 3.2, 6.1, and 10.2 giving it discretion over discipline and discharge, hours of work, overtime, layoffs, and subcontracting; and CEC's rejection of the Union's contrary proposals and counterproposals.  Cf. *Santa Barbara News-Press*, above (finding bad faith where the employer insisted on a management rights provision that similarly preserved all of its "common law rights prerogatives and functions to manage the business" as they existed before the union unless expressly and specifically limited by the agreement, and listed numerous rights that were not abridged by the agreement).

Of similar limited effect was CEC's modification to section 10.4 regarding grievances.  The modification did not add any provisions for arbitration of disputes under the contract at the final step.  Rather, it only added provisions for mediation.  Further, it provided for mediation only of grievances involving discipline that resulted in leave without pay or termination; it did not provide for mediation of grievances involving any other discipline or disputes.  Moreover, it gave CEC discretion not to agree to mediate any discipline involving "grave" offenses.  According to the "disciplinary matrix" CEC concurrently proposed, this included over 50 types of offenses, including such broad categories as "circumventing any company policies or processes to favor oneself," "breaching management's trust," "dishonesty in any form," "culpable acts or omissions causing damage to the cooperative's interest," and "displaying bad manners such as the use of abusive or insulting language."  Finally, it required the employee or the Union to pay "any and

---

[50] "Employment at will . . . means employees can be discharged for any reason or no reason at any time."  *Boeing Co.*, 365 NLRB No. 154, slip op. at 10 (2017).

[51] Compare *Coastal Electric Cooperative*, 311 NLRB 1126 (1993) (finding that employer's insistence on several such provisions was not sufficient by itself to establish bad faith bargaining).  The complaint could be read to allege that CEC's insistence on the above and other

provisions also constituted independent 8(a)(5) violations.  However, the General Counsel's posthearing brief argues only that it evidenced CEC's bad faith.  In any event, I do not find that any of CEC's proposals independently violated Section 8(a)(5) of the Act.  See *Altura Communication Solutions*, above, slip op. at 1; and *Houston County Electric Cooperative, Inc.*, 285 NLRB 1213, 1215–1216 (1987), and cases cited there.  See also *George Washington University Hospital*, 370 NLRB No. 118, slip op. at 6–7 (2021), notice to show cause why the decision should not be vacated and the case re-adjudicated issued July 14, 2022.

all fees incurred" in the mediation and stated that the general manager's decision would "remain in effect" if the parties failed to reach agreement.

Martinez testified that the foregoing mediation and matrix proposals were intended to demonstrate CEC's willingness to move towards arbitration.[52]   But a preponderance of the evidence indicates otherwise.   At the August 6 session, CEC said it was researching mediation as an "alternative" to arbitration, not as an additional step towards arbitration.   Further, CEC had taken shifting positions with respect to arbitration.   At the August 6 session, CEC told the Union that it would "consider" agreeing to arbitration.   However, at the August 13 session, CEC told the Union that all discipline "has to" conclude and be deemed final within the organization; that there was "no way" to conclude the disciplinary process external to the company; and that if the Union wanted to "appeal" a disciplinary decision it could file a charge with the NLRB.   Thereafter, at the October 2 session, CEC stated that it had "looked at arbitration but it would require a matrix of discipline and expanding it because that would be the expectation of the arbitration."   Yet, on October 14, when CEC proposed such a disciplinary matrix, it coupled it with mediation rather than arbitration.   Further, as discussed below, by predetermining discipline for over 100 offenses, the proposed matrix was more a barrier than a door to meaningful arbitration.

Considered in the context of the other indicia of CEC's bad faith, these circumstances indicate that, rather than a sincere move towards arbitration, CEC's mediation and matrix proposals were simply another tactic to frustrate an agreement.   Cf. *Houston County Electrical Cooperative*, 285 NLRB at 1215 (finding that the employer "shift[ed] its positions on grievance-arbitration to thwart agreement on that subject").   See also *Smith's Complete Market*, 237 NLRB 1424, 1439 (1978) (finding that the employer's "shift of positions on pensions and health and welfare were not so much concessions as vacillations having the effect if not the purpose of keeping negotiations in a state of disequilibrium").[53]

### 5. Making regressive proposals

CEC also proposed a number of specific provisions after the February 26 session that were even less favorable or more restrictive to the Union and the employees than those in CEC's initial proposal.   For example, CEC's April 14 amended proposed contract modified article V to require a union steward to perform his duties outside of normal working hours; modified article XXI to lower the cap on CEC's 401k contributions from

"1%" to ".01%" of the employees' base wages; and modified article XXIII to reduce the wage increases in the second and third year of the contract from two to one percent.

CEC's August 6 amended proposed contract likewise included regressive proposals. It added a new section 3.6 prohibiting either party from engaging in any "subterfuge" to defeat or evade the terms of the contract; a new section 4.2 prohibiting the Union or its agents from coercing employees or soliciting them during their working hours to become union members; and a new section 4.3 prohibiting the union and its members from intimidating or coercing employees to become union members. It also added a new section 13.2 stating that employees who work overtime would not be given time off without pay to equalize overtime.

CEC's October 1 and 14 amended proposed contracts also included regressive proposals.   The October 1 amended proposal modified section 25.5 to reduce the number of CEC-provided flame-retardant shirts and pants from 11 to 9.  And, as discussed above, the October 14 amended proposal modified section 10.2 and added a disciplinary matrix that vastly increased the types of offenses previously listed in section 9.2 that would warrant immediate discharge. It also added a sentence in section 10.5 (formerly 10.4) stating that a grievance must be filed "within 2 calendar days of the alleged event or action that is the basis for the grievance."

The Board has long recognized that making such regressive proposals may evidence an employer's bad faith.   The Board considers the totality of the circumstances, including the parties' bargaining history; the timing of the regressive proposals; whether the prior proposals had been tentatively agreed to; whether the union had previously made regressive proposals; whether the employer's bargaining position had strengthened or there were changed economic or other circumstances prior to the regressive proposals; whether the employer explained the regressive proposals; whether the employer's explanations were illegitimate, illogical, or unreasonable; whether the regressive proposals were the result of a mistake or error that was timely corrected, and other evidence of the employer's intent. See, e.g., *Management & Training Corp.*, 366 NLRB No. 134, slip op. at 4–5 (2018). *Kitsap Tenant Support Services*, supra, 366 NLRB No. 98, slip op. at 8; *Whitesell Corp.*, 357 NLRB 1119 (2011); *St. George Warehouse, Inc.*, 349 NLRB 870, 876–877 (2007); *Mid-Continent Concrete*, 336 NLRB 258, 260 (2001), enfd. sub nom. *NLRB v. Hardesty Co.*, 308 F.3d 859 (8th Cir. 2002); *U.S. Ecology Corp.*, 331 NLRB 223, 225–226 (2000), enfd. 26 Fed.Appx. 435 (6th Cir. 2001); *National Steel and Shipbuilding Co.*, 324 NLRB 1031, 1042 (1997); *Houston County Electrical Cooperative*, 285 NLRB at 1215; *Rescar, Inc.*, 274 NLRB 1, 2 (1985); *Pipe Line Development Co.*, 272 NLRB 48, 49–50 (1984); and *Barry-Wehmiller Co.*, 271 NLRB 471 (1984).

Here, contrary to the General Counsel's posthearing brief, the evidence fails to establish that CEC's April 14 regressive proposals regarding wage increases and union stewards were proposed in bad faith.   The changes were made early in the negotiations (after the February 25 session) and before the Union had specifically responded to CEC's initial proposal on those subjects.   Further, CEC's explanations for the changes—

---

[52] See Tr. 419–420.  Although Martinez initially testified that he proposed the matrix with the intent of moving the conversation towards federal "mediation," his subsequent testimony indicates that this was a misstatement.   And CEC's posthearing brief (p. 28) implicitly acknowledges as much.

[53] In reaching this conclusion, I have considered CEC's subsequent statements at the October 29 and November 20 sessions, after the Union filed its new bad-faith bargaining charge, indicating a willingness to consider arbitration under certain limited circumstances.   However, for the reasons discussed infra, and based on the record as a whole, I find that CEC's post-charge statements were just more of the same to maintain a façade of flexibility.

anticipated increases in healthcare costs and likely business disruptions and disputes over what constituted a 'reasonable and sufficient' time if steward duties were performed during working hours—were not so unreasonable as to warrant a conclusion that they were offered in bad faith.

The same is true with respect to CEC's August 6 proposals adding sections 3.6, 4.2, 4.3, and 13.2. The Union's only objection to 3.6 was that it was vague and unnecessary, and CEC gave an example to clarify and justify it. As for the other sections, the Union's objection was that they addressed matters already covered under federal law. However, the General Counsel does not contend that they unlawfully deprived the employees or the Union of rights under federal law. Nor does the General Counsel cite any prior Board decisions finding bad faith based on such proposals.

The record also fails to establish that CEC's October 1 reduction in the number of CEC-provided flame-retardant shirts and pants was made in bad faith. CEC had previously notified the Union on August 7 that this modification was going to be made, and its explanation (that it had a new laundry service and wanted to reduce the number under the new service contract to reflect that employees were now working only 4days per week) was not unreasonable.[55]

However, a different conclusion is warranted with respect to the remaining three regressive proposals.

*April 14 change capping CEC's 401k contributions at ".01%" of base wages.* Martinez, who drafted the April 14 changes, testified that he told the Union that this change was meant only to convert the cap from a percentage (1%) to a decimal (.01), but that he inadvertently failed to cross out the percentage sign, and that he would fix it. (Tr. 376–377, 388.) This testimony is generally supported by the April 16 and August 13 bargaining notes taken by HR Supervisor Morris and Office Manager Marrufo, which indicate that Martinez insisted there was no actual change, told the Union to "Google it," and offered at the August 13 session to put "1%" back in "to make it clear."[56]

However, that was not the end of the matter. CEC never actually put "1%" back in. Nor did it take out the percentage sign after the decimal. Martinez testified that the failure to do so was just an "oversight on our part." But this strains credulity too far. The Union had twice objected to the April 14 modification, on April 16 and August 13. Martinez had personally indicated on August 13 that he would correct it. And he had at least three ready opportunities to do so when CEC submitted its

subsequent amended and updated proposals on October 1 and 14 and December 3.

Moreover, CEC failed to offer any testimony or other evidence to corroborate Martinez's testimony. Although CEC called both HR Supervisor Morris (who was present and took notes at the April 16 and August 13 sessions) and Office Manager Marrufo, (who was likewise present and took notes at the August 13 session and helped Martinez update the subsequent amended proposals with highlights) to testify, it never asked them about the matter. See *Flexteel Industries*, 316 NLRB 745, 757–758 (1995) (drawing "the strongest possible adverse inference" against the respondent for failing to question a favorable witness regarding a factual issue upon which the witness would likely have knowledge).

I therefore find that the truth is the opposite; that CEC made a deliberate decision not to put "1%" back in. See *Ozark Automotive Distributors, Inc. v. NLRB*, 779 F.3d 576, 585 (D.C. Cir. 2015); and *NLRB v. Howell Chevrolet*, 204 F.2d 79, 86 (9th Cir.) affd. 346 U.S. 482 (1953) (where witnesses are discredited, the trier of fact may find, not only that their testimony was untrue, but that the truth is the opposite of their testimony). Given CEC's failure to explain this decision, I also infer and find, based on the record as a whole, that CEC did so in bad faith and to frustrate any agreement.

*October 14 addition of new disciplinary matrix.* As indicated above, CEC's new disciplinary matrix listed over 50 "grave" offenses that would result in immediate termination, almost triple the number specially listed in sections 9.1 and 9.2 of its previous proposals. It also predetermined discipline for over 50 "serious," "moderate," and "light" offenses. Further, as discussed above, Martinez's testimony that the matrix was proposed as part of CEC's attempt to move towards arbitration is contrary to a preponderance of the evidence. Indeed, as indicated by the General Counsel, by setting forth predetermined discipline for over 100 offenses, and considered in combination with other provisions giving CEC discretion to discharge employees at will, the matrix would have largely rendered arbitration meaningless. Cf. *Regency Service Carts*, 345 NLRB at 675 (finding bad faith in part because the employer's proposed management rights clause rendered meaningless the proposed grievance and arbitration clause).

*October 14 requirement that grievances be filed within two calendar days.* The Union's initial, September 25, 2020 proposal stated that grievances must be submitted in writing within 15 calendar days from the date the grievance or difference becomes apparent. CEC's initial, February 26, 2021 proposal countered this by proposing just "two workdays" after the occurrence or denial by the supervisor. Unsurprisingly, the Union objected to such a short deadline at the parties' next session on April 16, arguing that, coupled with CEC's other proposals allowing only one steward to service both locations and only during nonworking hours, the time limit would make processing grievances administratively impossible.

Nevertheless, as indicated above, 6 months later, on October 14, CEC proposed an even narrower time limitation of just "2 calendar days" after the alleged event or action that is the basis of the grievance. This was obviously an even more objectionable proposal, not only because it was a shorter time limit, but

---

[55] Strand testified that he requested a copy of the service contract, but CEC never provided it (Tr. 95). However, the complaint does not allege that CEC's failure to do so was unlawful.

[56] The General Counsel's posthearing brief questions Martinez's explanation, arguing that there is no apparent reason why Martinez would change the percentage to a decimal, and that he did not change the "18%" cap on retirement contributions in the previous subsection. However, there is also no apparent reason why he would have justified the change on this ground if it was untrue, as it would raise an expectation that the change would be corrected. He could well have offered the same economic justification he offered for lowering wage increases (to offset anticipated increases in healthcare costs), in which event there would be no such expectation.

also because the linemen regularly worked only 4 days a week. And CEC offered no explanation for it. Thus, again, like the matrix, it appears to have been proposed to create yet another barrier to reaching an agreement.

### 6. Making and failing to revise inconsistent and incorrect proposals

As discussed above, CEC's proposals contained several inconsistent provisions. For example, Section 6.1 said CEC could discharge employees for "just cause," but other provisions, which CEC never withdrew, indicated that, notwithstanding this language, CEC could discipline and discharge employees at will for any reason it determined to be in its best interests. And CEC's proposed matrix said a first "serious" offense would be punished by four days suspension without pay, but Section 9.2 said any "serious" infraction would result in immediate termination.

CEC also repeatedly prepared inaccurate updates on the status of the parties' negotiations. For example, CEC's own bargaining notes from the August 13 session indicated that the Union specifically objected to section 9.3, which stated that any discipline or discharge "shall be deemed final." Nevertheless, CEC's subsequent October 1 amended proposal highlighted the section in yellow to indicate the Union had agreed to it. So did its October 14 and later amended proposals, even though CEC's bargaining notes indicated that the Union specifically objected to the yellow highlighting at the October 2 session. CEC's October 1 amended proposal also inaccurately struck through the Union's proposed articles on union representation and seniority in the Union's table of contents to indicate that the Union had agreed they were permissive and would be withdrawn, even though the Union had never done so. When the Union on October 2 specifically objected to striking through the union representation article, CEC said it would highlight it in grey to indicate it had been discussed but not agreed to. However, its December 3 amended proposal again struck through the article on the Union's table of contents without any grey highlighting.

This was obviously not conduct conducive to building trust and reaching agreement. Like CEC's shifting positions on arbitration, its inconsistent proposals on discipline were likely to "keep negotiations in a state of disequilibrium" (*Smith's Complete Market*, supra). And its repeated inaccuracies were also likely to create confusion and delay. Further, as with CEC's failure to change the cap on 401k contributions back to "1%," it is unlikely this conduct was entirely inadvertent. Given all of the other circumstances indicating CEC's bad faith, it is therefore reasonable to conclude that it was not, and that it was likewise intended to frustrate any agreement.

### 7. Refusing to provide requested information

CEC timely provided the Union with information regarding the unit employees' current terms and conditions of employment in response to the Union's initial request in March 2020. However, in April and July, CEC refused to provide the Union with requested disciplinary records, which the Union sought in order to bargain and/or file grievances over CEC's existing process over the recent discipline or discharge of certain employees. And the following year, in October 2021, CEC re-

fused to provide the Union with requested information about the Cooperative's use of contractors to perform unit work, which the Union sought because it was relevant to the parties' ongoing negotiations over wages and management rights.

*April and July 2020 requests for disciplinary records.* It is well established that an employer must bargain on request with a newly certified union, not only over an initial contract, but also over particular matters that arise affecting the unit employees' terms and conditions of employment, including the employer's discharge or discipline of a unit employee. See *Fallbrook Hospital*, 360 NLRB 644, 654–655 (2014), enfd. 785 F.3d 729 (D.C. Cir. 2015). As part of that obligation, the employer must timely provide the union with requested relevant information. Ibid. CEC was therefore obligated to provide the information requested by the Union in April and July 2020 relevant to the discipline and discharge of unit employees, including the documentation CEC relied on and records of similar and other discipline CEC issued to other unit employees.

The Union's requests also sought records of discipline issued to nonunit employees. And, unlike information about unit employees, information regarding nonunit employees is not presumptively relevant. Thus, a union must demonstrate the relevance, or the relevance must be apparent under the circumstances. *Disneyland Park*, 350 NLRB 1256, 1257–1258 (2007). In this instance, the relevance was both demonstrated and apparent. The Union indicated it was seeking the information to bargain or file grievances over the discharge or discipline of the unit employees. And "[i]t is well established that nonunit information may be relevant to show disparate treatment in the application of work rules." *FCA US LLC*, 371 NLRB No. 32, slip op. at 2 (2021).

In any event, even assuming the Union's requests were overbroad to the extent they requested disciplinary records involving nonunit employees, this did not excuse CEC's refusal to provide the disciplinary records of unit employees. An employer may not simply refuse to comply with an overbroad information request but must comply to the extent it encompasses relevant and necessary information. See *American Medical Response of Connecticut, Inc.*, 371 NLRB No. 106, slip op. at 1 fn. 4 (2022); and *Rockwell Mining LLC*, 367 NLRB No. 46, slip op. at 4 (2018), enfd. 786 Fed.Appx. 268 (D.C. Cir. 2019), and cases cited there.

CEC's refusal to provide any of the requested information is therefore additional evidence of its bad faith. Although the Union did not request the disciplinary records for use in the contract negotiations, the Board considers conduct both at and away from the bargaining table in evaluating whether an employer violated its duty to bargain in good faith. *Hilton Anchorage*, 370 NLRB No. 83, slip op. at 2 (2021). See also *Allied Mechanical Services, Inc.*, 332 NLRB 1600 (2001). Here, CEC's refusal to provide such information is further circumstantial evidence that its contract proposals on those subjects were intended to frustrate an agreement. See generally *Continental Insurance Co. v. NLRB*, 495 F.2d at 48 ("[M]otive must of necessity be ascertained from circumstantial evidence . . . Specific conduct, while it may not, standing alone, amount to a per se failure to bargain in good faith, may when considered with all of the other evidence, support an inference of bad

faith.").

*October 2021 request for subcontracting information*. There are at least two situations where an employer may be required during contract negotiations to provide a union with requested information regarding subcontractors, including their identity, number, classifications, and wages. One is where the union seeks the information to evaluate whether unit work and wages could be increased by eliminating or reducing the use of such contract workers. See *Putnam Ridge Nursing Home*, 369 NLRB No. 28, slip op. at 21 (2020); and *Castle Hill Health Care Center*, 355 NLRB 1156, 1182 (2010). Another is where the union seeks the information to evaluate the extent of subcontracted work covered by a management rights proposal and intelligently bargain over that subject. See *DirectSat USA, LLC*, 366 NLRB No. 40, slip op. at 2 (2018); *Galaxy Towers Condominium*, 361 NLRB 364 n. 4 (2014); and *Western Massachusetts Electric Co.*, 228 NLRB 607, 622–623 (1977), enfd. in relevant part 573 F.2d 101, 107 (1st Cir. 1978).[57]

As contract workers are not unit employees, however, as indicated above the union must offer a reasonable explanation based on objective evidence why such information is relevant, or the relevance must be apparent under the circumstances. See *Disneyland Park*, above. See also *Galaxy Towers Condominium*, 361 NLRB 364 fn. 4 (2014); and *Richmond Health Care*, 332 NLRB 1304 fn. 1 (2000). Similarly, if the union requests financial information regarding the cost of subcontracting the unit work, the union must demonstrate a specific need for that information. See *Western Massachusetts Electric Co.*, 228 NLRB 607, 622–623 (1977), enfd. in relevant part 573 F.2d 101, 107 (1st Cir. 1978). See also *West Penn Power Co. v. NLRB*, 394 F.3d 233 (4th Cir. 2005), on remand 346 NLRB 425, 428 (2006).

Here, the relevance of and need for the requested subcontracting information was again both demonstrated and apparent. The Union first raised concerns about CEC's use of contractors to perform unit work at the October 2 session, saying that the Union had been told the contract workers were being paid more than the unit employees. CEC confirmed that it was using contract workers (and also later admitted at the November 20 session that using them cost CEC more). CEC asserted that it used the contractors to perform incremental, short-term work and that there was not enough such work to justify hiring additional full-time unit employees to do it. Accordingly, 2 days later, the Union requested CEC to provide "the number, classification and wage rates each of the contractors is filling that involves work being done that was formerly performed by unit employees," "the business name of these contractors" and the number of their employees "they have performing the work." The Union explained that it was requesting this information because of the reports it received that CEC was using contract workers to perform certain unit work at higher wage rates, and because the

information was relevant to the parties' contract negotiations regarding both the unit employees' wages and CEC's management rights proposal.

These circumstances were sufficient under the above-described Board precedent to trigger CEC's duty to provide the requested information. Further, CEC has not proffered any reason justifying its failure and refusal to do so. Although CEC asserted at the October 2 session that it did not have access to the contract workers' wage rates (an assertion repeated in CEC's posthearing brief), there is no evidence that CEC ever asked the contractors for the information. CEC has therefore failed to carry its burden of demonstrating that the wage rate information was unavailable. See *Sho-Me Power Electric Cooperative*, 360 NLRB 349, 355 (2014); and *Public Service Co. of Colorado*, 301 NLRB 238, 246–247 (1991), and cases cited there.

Accordingly, I find that CEC unlawfully refused to provide the requested subcontracting information to the Union, as alleged. I also find that its refusal to do so is additional evidence of its intent to avoid reaching any agreement with the Union. See generally *Regency Service Carts*, 345 NLRB at 675 ("The refusal to provide without undue delay requested information which is relevant to the Union's efforts at negotiating a contract is an indicium of surface bargaining"), and cases cited there.

### 8. Other conduct

The General Counsel alleges or argues that various other conduct is also evidence of CEC's bad faith. However, unlike those discussed above, these allegations or arguments are not well supported.

For example, as previously noted (fn. 49), the record does not support the General Counsel's argument that CEC failed to cloak its bargaining representatives with sufficient authority at the September 25 session. Nor does the evidence support the General Counsel's allegation and argument that CEC insisted on bargaining based only on its own proposals and refused to give its position on the Union's proposals.

The General Counsel also argues that CEC's bad faith is evidenced by its refusal to allow Munoz unpaid time off to attend the bargaining sessions, thereby delaying the negotiations.[58] However, the GC does not allege that CEC's refusal to grant Munoz unpaid time off was unlawful. And Board and court decisions would not support such an allegation, as CEC offered a reasonable justification for its refusal to do so and agreed to bargain on Munoz's day off (Friday) and on weekends. See *Ceridian Corporation v. NLRB*, 435 F.3d 352 (D.C. Cir. 2006), and cases cited there. For the same reason, I find that it is not evidence of bad faith.

The General Counsel also argues that CEC's bad faith is evidenced by its refusal to participate in mediation through the FMCS after the parties declared impasse on December 4, 2021. However, again, the GC does not allege that CEC's refusal to do so was unlawful. And Board precedent likewise would not support such an allegation. See *Midas International Corp.*, 150

---

[57] Proposals on subcontracting of unit work are a mandatory subject of bargaining. *Presbyterian University Hospital*, 320 NLRB 122 fn. 2 (1995). This is so even if the employer previously subcontracted unit work, as it affects the unit employees' terms and conditions of employment by reducing the amount of unit work. See *WCCO-TV*, 362 NLRB 859, 860 (2015).

[58] The General Counsel does not allege or argue that CEC otherwise failed or refused to schedule bargaining sessions or to meet and bargain with the Union after the January 2021 settlement of the Union's previous charges.

26                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

NLRB 486, 487 (1964) ("The Act does not, under pain of an 8(a)(5) violation, impose acceptance of mediation as a necessary element of good-faith bargaining."). See also *Success Village Apartments, Inc.*, 347 NLRB 1065, 1068 (2006) (the use of mediation as a bargaining process is a permissive subject of bargaining). Further, while the refusal to mediate might be evidence of bad faith "in the proper context" (*Midas International*, above), the GC cites no prior case finding it to be such evidence in circumstances similar or analogous to those present here.

As for CEC, it argues that other conduct establishes its good faith. For example, it complied with the Union's initial request for information concerning the unit employees' terms and conditions of employment; proposed dates to meet for negotiations after the January 2021 settlement and met with the Union on 11 occasions over the next 11 months, including on weekends; and denied that its proposed contract was a "take it all or leave it all proposal" and invited the Union to make counterproposals. However, I reject this argument as well. While not insignificant, such actions are insufficient to outweigh the numerous and compelling indicia of CEC's bad faith discussed above. Cf. *Altura Communications*, supra, 369 NLRB No. 85, slip op. at 37 (finding that the employer bargained in bad faith even though it attended bargaining sessions and provided requested information); and *Sunbelt Rentals*, 370 NLRB No. 102, slip op at 3–4 (2021) (finding unlawful surface bargaining even though "not all of the [employer's] bargaining conduct demonstrated bad faith," as a preponderance of the evidence indicated that the employer was "merely going through the motions of collective bargaining and had no real intention of reaching agreement"). See also *Hilton Anchorage*, supra, 370 NLRB No. 83, slip op. at 2 (the obligation to bargain in good faith is "not fulfilled by 'purely formal meetings," but also requires "a serious attempt to resolve differences and reach a common ground."), quoting *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485-486 (1960); *RBE Electronics of S.D., Inc.*, 320 NLRB 80, 88 (1995) ("Mere willingness to talk does not constitute a willingness to bargain collectively"); and *NLRB v. Herman Sausage Co*, 275 F.2d, 229, 231–232 (5th Cir 1960) ("[T]o sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail").

Finally, I also reject CEC's argument that the Union failed to sufficiently test its willingness to bargain by submitting counterproposals on management rights, discipline, discharge, grievances, and the matrix after the October 14 session. In support of this argument, CEC cites *PSAV Presentation Services*, 367 NLRB No. 103 (2019), affd. sub nom. *Theatrical Stage Employees Local 15 v. NLRB*, 957 F.3d 1006 (9th Cir. 2020). However, that case is factually distinguishable. There, the parties had met only five times over 8 months, the employer had made concessions and tentatively agreed to several provisions during that time, and the Board found that there was little evidence that it had bargained in bad faith.

The circumstances here are significantly different. As indicated above, the parties met 11 times over 11 months after the January 2021 settlement of the Union's charges. During that time, the Union agreed to several of CEC's proposed articles,

including articles I (statement of agreement), VIII (light duty), XIV (on call pay and call out pay), XV (EEO), XVII (employee travel expenses), XVIII (paid time off), XIX (inclement weather), XXII (CDL), and XXXI (strikes, stoppages, and lockouts), and several sections in article XXV (safety). The Union also offered significant compromises on several articles/subjects, including the term of agreement, union representation/stewards, and wages. The Union even agreed to withdraw its dues checkoff proposal after CEC asserted that it was a permissive subject.[59] In contrast, CEC did not agree to any of the Union's proposed articles except a few that its initial proposed contract had incorporated from CEC's employee manual.

Nor did CEC agree to compromise in a meaningful way on any of its own proposals and amended proposals in response to the Union's objections, counterproposals, and compromises. As discussed above, CEC agreed on October 14 to drop the last sentence in section 10.2 regarding its unfettered right to terminate any employee or modify or terminate any benefit or compensation or condition of employment. And it previously agreed on August 6 to delete the last sentence in section 16.1 regarding its unfettered right to terminate an employee at the end of the introductory period. However, CEC continued to insist on including other provisions in sections 3.2, 3.5, 6.1, and 10.2 to the same effect. Similarly, CEC agreed on October 14 to drop the sentence in section 10.4 limiting any "informal discussions" at the first step of the internal grievance process to "the end of the workday." However, it simultaneously added another significant restriction requiring any grievance to be filed "within 2 calendar days."

Moreover, CEC repeatedly demonstrated its continuing bad faith during this period. As discussed above, it proposed predictably unacceptable provisions that deprived the Union of its representational role; made regressive, inconsistent, and incorrect proposals and failed to revise them; and refused to provide the Union with requested subcontracting information relevant to the parties' negotiations over wages and management rights.

Finally, Martinez' statements at the penultimate November 20 session offered little reason to believe that countering CEC's matrix would be fruitful. Martinez testified that he encouraged the Union to submit a counterproposal. Specifically, he testified that when Strand stated at the session that he would prepare a counter with a less expansive matrix, he responded, "Good, now I think we're making progress" (Tr. 425). However, this is not corroborated by Office Manager Marrufo's bargaining notes. Her notes indicate that Martinez responded by repeating that there needed to be "sufficient clarity in the contract" "to get where you want to go, which is binding arbitration." And he then added another limitation: there could be no arbitration of "lower level discipline."

Accordingly, for all the foregoing reasons, I find that CEC unlawfully bargained in bad faith with no intention of reaching

---

[59] As previously noted, CEC's assertion was incorrect. However, the General Counsel does not allege or argue that CEC's refusal to bargain over or agree to dues checkoff is additional evidence of bad faith. Cf. *Sunbelt Rentals, Inc.*, 370 NLRB No. 102, slip op. at 3 and fn. 11 (2021) (finding that employer's unexplained opposition to dues checkoff was additional evidence of surface bargaining).

an agreement, as alleged.

CONCLUSIONS OF LAW

1. Since April 22, 2021, CEC has failed and refused to bargain in good faith with the Union over a first contract in violation of Section 8(a)(5) and (1) of the Act.

2. Since October 4, 2021, CEC has failed and refused to provide relevant and necessary information requested by the Union regarding the number, classification, and wage rates of contractors performing unit work, the business name of those contractors, and the number of their employees performing the unit work, in violation of Section 8(a)(5) and (1) of the Act.

3. CEC's foregoing unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

CEC will be ordered to cease and desist its unlawful conduct and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, CEC will be ordered to bargain in good faith with the Union and, if an agreement is reached, embody that agreement in a signed contract. In addition, CEC shall be required to: (1) submit written progress reports to the NLRB Region 28 compliance officer, with service on the Union, every 30 calendar days until an agreement or good faith impasse is reached; and (2) compensate the Union for all bargaining expenses it has incurred from April 22, 2021 through the date good faith negotiations ultimately begin. As indicated by the General Counsel, these two additional remedies are warranted here given the extent of CEC's bad-faith conduct, both before and after the January 2021 settlement, in disregard of well-established Board law, and the substantial time and resources the Union expended attempting to engage CEC in good faith negotiations. See *KOIN-TV*, 371 NLRB No. 118, slip op. at 2–3 (2022); and *WR Reserve*, 370 NLRB No. 74, slip op. at 4–5 (2021), enfd. sub nom. *NLRB v. Noah's Ark Processors LLC*, 31 F.4th 1097 (8th Cir. 2022), and cases cited there.[60] CEC shall also be required to provide the Union with the information it requested on October 4 regarding the use of contractors to perform unit work. Finally, CEC will be required to post a notice to employees advising them of the Board's decision.

---

[60] The General Counsel also requests that CEC be required to: (1) meet and bargain for a minimum of 16 hours per week; and (2) engage an FMCS mediator at the Union's request. However, as previously discussed, there is no allegation that CEC has been dilatory in scheduling meetings with the Union since January 2021, and I have rejected the GC's contention that CEC's refusal to give Munoz unpaid time off to bargain evidenced bad faith. As for requiring CEC to engage a mediator, it appears that such a remedy has not yet been embraced by a Board majority. See Member Prouty's concurring footnote in *KOIN-TV*, above, slip op at 4 fn. 7 (stating that he would have additionally authorized the Regional Director, at the union's request, to appoint a mediator from a list of those qualified on an ABA panel for the Regional Office area) citing *Altofer Machinery Co.*, 332 NLRB 130, 131 (2000) (Member Hurtgen concurring in part), and *Mid-Continent Concrete*, 336 NLRB at 263 (2001) (Chairman Hurtgen, concurring in part)).

ORDER

The Respondent, Columbus Electric Cooperative, Inc., Deming and Animas, New Mexico, its officers, agents, successors, and assigns, shall

1. Cease and desist from the following conduct.

(a) Failing and refusing to bargain in good faith with International Brotherhood of Electrical Workers, Local 611, AFL–CIO as the exclusive collective-bargaining representative of the full-time and regular part-time apprentice and journeyman lineman employed by the Cooperative.

(b) and refusing to provide the Union with requested information that is relevant and necessary to its role as the unit employees' exclusive collective-bargaining representative.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the unit employees concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

(b) Submit written bargaining progress reports every 30 days to the NLRB Region 28 compliance officer, with service on the Union, until an agreement or good faith impasse is reached.

(c) Compensate the Union for all bargaining expenses it has incurred from April 22, 2021, through the date that good faith negotiations ultimately begin. Upon receipt of a verified statement of costs and expenses from the Union, the Respondent shall promptly submit a reimbursement payment in the stated amount to the NLRB Region 28 compliance officer, who will document receipt and forward the payment to the Union.

(d) Provide the Union with the information it requested on October 4, 2021, regarding the use of contractors to perform unit work.

(e) Post at its Deming and Animas facilities copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed a facility involved in this proceeding, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at that facility at any time since April 22, 2021.[61]

---

[61] If a facility involved in this proceeding is open and staffed by a substantial complement of employees, the notice must be posted within

28               DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(f)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.,  September 19, 2022

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain in good faith with International Brotherhood of Electrical Workers, Local 611, AFL–CIO as the exclusive collective-bargaining representative

---

14 days after service by the Region. If the facility is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

of the full-time and regular part-time apprentice and journeyman lineman employed by us.

WE WILL NOT fail or refuse to provide the Union with requested information that is relevant and necessary to its role as the exclusive collective-bargaining representative of the unit employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, on request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the unit employees concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

WE WILL submit written bargaining progress reports every 30 days to the NLRB Region 28 compliance officer, with service on the Union, until an agreement or good faith impasse is reached.

WE WILL compensate the Union for all bargaining expenses it has incurred from April 22, 2021, through the date that good faith negotiations ultimately begin.

WE WILL provide the Union with the information it requested on October 4, 2021, regarding the use of contractors to perform unit work.

COLUMBUS ELECTRIC COOPERATIVE, INC.

The Board's decision can be found at www.nlrb.gov/case/28-CA-285046 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

